

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-1-1996

# Orson Inc v. Miramax Film Corp

Precedential or Non-Precedential:

Docket 95-1399

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Orson Inc v. Miramax Film Corp" (1996). *1996 Decisions.* Paper 187.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/187

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————

No. 95-1399

————————

ORSON, INC.
t/a ROXY SCREENING ROOMS

vs.

MIRAMAX FILM CORP.

Orson, Inc., d/b/a/ Roxy Screening Rooms,

Appellant

————————

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 93-cv-04145)

————————

Argued
January 22, 1996
Before: MANSMANN and LEWIS, Circuit Judges, and
RESTANI, Judge, Court of International Trade.*

(Filed April 1, 1996)

————————

Paul R. Rosen, Esquire (Argued)
Jeffrey M. Goldstein, Esquire (Argued)
Spector, Gadon & Rosen
1700 Market Street
29th Floor
Philadelphia, PA  19103

  COUNSEL FOR APPELLANT

Thomas E. Zemaitis, Esquire (Argued)
Barbara T. Sicalides, Esquire
James W. McGarry, Esquire
Pepper, Hamilton & Scheetz
18th & Arch Streets
3000 Two Logan Square
Philadelphia, PA  19103

  COUNSEL FOR APPELLEE

*       Honorable Jane A. Restani, Judge, United States Court of International Trade, sitting by designation.

———————

OPINION OF THE COURT

———————

MANSMANN, Circuit Judge.

This antitrust case arises out of a business arrangement in the motion picture industry. The plaintiff, Orson, Inc., the owner of the Roxy Screening Rooms, a movie theater, alleged that the defendant, Miramax Film Corporation, a film distributor, violated section 1 of the Sherman Act, 15 U.S.C. § 1, and Pennsylvania common law by conspiring with another theater to drive the Roxy out of business and by granting that other theater exclusive, first-run licenses on Miramax films. Orson also charged that the licenses violated the length-of-run provision of Pennsylvania's Feature Motion Picture Fair Business Practices Law. 73 P.S. § 203-7. Orson now appeals the district court's decision to grant Miramax's motion for summary judgment.

We hold that Orson failed to present evidence sufficient to show that Miramax engaged in an antitrust conspiracy or that the licenses were unreasonable restraints of trade. We further hold that the district court erred in interpreting 73 P.S. § 203-7's requirement concerning the geographic expansion of first-run films. Thus, we will affirm the judgment of the district court granting summary judgment to Miramax on Orson's antitrust claims. We will, however, vacate

2

the district court's grant of summary judgment to Miramax on Orson's state statutory claim and remand for further proceedings.

I.[0]

In January of 1992, Orson assumed the operations of the Roxy, a movie theater located in downtown "Center City" Philadelphia. The Roxy exhibited "art films," as opposed to movies that may be characterized as "commercial" or "mainstream," on two screens, each with a 130 person seating capacity. The Roxy charged between $3.50 and $5.50 for tickets.

The Ritz theaters, consisting of two separate five-screen facilities, the Ritz Five Theaters and the Ritz at the Bourse (collectively, the "Ritz"), also exhibited art films in Center City. The Ritz Five Theater, which opened in 1976 with about 1,125 seats, was owned and operated by the Posel Corporation; the Ritz at the Bourse, opened in 1990 with approximately 710 seats, was owned and operated by the Raysid Corporation. Ramon L. Posel was the President of both corporations. The Ritz's admission prices typically ranged from $3.50 to $6.00.

In addition to the Roxy and the Ritz, there were six other theaters in Center City; four theaters with a total of 20

---

[0] We begin our analysis by reviewing the evidence presented in this case. In considering a motion for summary judgment, a court does not resolve factual disputes or make credibility determinations, and must view the facts and inferences in the light most favorable to the party opposing the motion. <u>Big Apple BMW, Inc. v. BMW of North America, Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992), <u>cert.</u> <u>denied</u>, 507 U.S. 912 (1993).

3

screens were operated by United Artists and two theaters with two screens each were operated by American Multi-Cinema.

Miramax, a nationwide distributor of feature-length motion pictures, including art films, distributed movies to all of the theaters located in Center City and to theaters in the greater metropolitan Philadelphia area.

In the motion picture industry, film distributors license films to theaters for exhibition for a given amount of time. Frequently, the license is exclusive, providing that during its duration, the film will not be licensed to other exhibitors in a prescribed area. Such licenses are called "clearances."

In the usual case, films are licensed for a sum which consists of a film rental amount and a house allowance. Under this system, the distributor and the exhibitor agree on a separate dollar amount which represents the exhibitor's weekly expenses. The exhibitor retains a percentage of the weekly gross from ticket receipts above the house expense allowance; the remaining percentage inures to the distributor. Typically, the license provides that the distributor will receive a minimum percentage of the exhibiting theater's box office gross. A film distributor's revenues, therefore, depend directly upon a theater's capacity to attract the public. Thus, the decision to license a movie to one theater or another is premised in considerable measure on a distributor's assessment of a theater's grossing ability.

4

The time a particular exhibitor is licensed to show a film is called the "run." A "first-run" is the first exhibition of a film in a given geographic area; "subsequent" runs are exhibitions of that film in the area after the first-run has expired. Successive runs of motion pictures are a practical necessity in the industry because commonly, there are a limited number of prints made of any one film.

Between January of 1992, when Orson began operating the Roxy, and February of 1994, the close of discovery, Miramax licensed about 28 films on a first-run basis and one film on a subsequent-run basis to the Ritz. By comparison, during this period, Miramax licensed one film on a first-run basis and approximately 14 films on a subsequent-run basis to the Roxy. Miramax also granted eight first-run licenses to the theaters in Center City operated by either United Artists or American Multi-Cinema[0] and six first-run licenses to theaters in the suburbs of Philadelphia.

At this same time, a number of other distributors also licensed films to the exhibitors in Center City. From the Roxy's opening in January of 1992 until March of 1994, Orson was granted about 73 first-run, exclusive licenses by 59 different distributors. According to Orson's President, Max L. Raab, art film distributors included, in addition to Miramax, three

---

[0]     As Miramax points out, any theater is equipped to exhibit art films and theaters which are not known as "art houses" can and do decide to show such films, as well as the more commercial fare.

5

"distributors of consequence" -- Sony Pictures Classics, the Samuel Goldwyn Company and Tristar Pictures.

All of the first-run licenses for films that Miramax granted to the Ritz were exclusive; that is, they provided that the films would not be licensed to another Center City theater while playing there. The licenses were established quite informally. Typically, Posel of the Ritz telephoned Martin Zeidman, Miramax's Senior Executive Vice President and head of domestic distribution, to discuss the Ritz's desire for a first-run license on a particular Miramax film. Having done business with one another for several years, Posel and Zeidman understood that the license would be exclusive and include standard terms. Once the parties agreed upon an opening date, Zeidman completed a "Theatrical Booking Worksheet," which set forth the title of the film and the opening date, listed the Ritz Five Theaters or the Ritz at the Bourse as the exhibitor, identified Posel as the buyer, marked the rental percentage terms, and designated the shipping territory as "Phila[delphia]." A day or two later, the booking worksheet was telefaxed from Zeidman's office in Los Angeles to Miramax's office in New York, which was responsible for shipping Miramax film prints to theaters in time for the opening date.

On occasion, Orson's film buyer, Jeffrey Fox Jacobs, asked Zeidman for a first-run, non-exclusive license on a Miramax film, indicating that Orson was prepared to offer Miramax a higher percentage of the Roxy's box office receipts and a lower

house allowance than those negotiated by the Ritz.  Jacobs' requests, however, were refused.

From time to time, Miramax held trade screenings for the movies it distributed in Philadelphia.  Miramax would send a notice to exhibitors, inviting them to attend the trade screening of a certain film on a certain date.  Most of the notices stated that "[w]e expect to avail this film for first run Philadelphia on or about [date], for an exclusive or non-exclusive run.  After the first run theater or theaters have exhibited the film for 42 days we will consider offers for subsequent runs."  The notice requested that a "written offer" be submitted by interested exhibitors by a specified time and day.

With respect to some of the clearances that Miramax granted the Roxy, the booking worksheet that Zeidman completed memorializing the clearance bore a date that was prior in time to the date of the trade screening notice that Miramax sent to exhibitors.[0]

Fifteen of the films that Miramax licensed to the Ritz played there for a period of more than 42 days.  Of these, nine expanded to other Philadelphia area theaters outside of Center City before the 42 days expired; six, however, ran at the Ritz, without expanding to other theaters.

---

[0]     For example, the trade screening notice for "The Crying Game" was dated December 1, 1992.  The notice announced that the first Philadelphia run would occur on or about December 18, 1992, invited Philadelphia exhibitors to a December 8, 1992, screening, and requested that written offers be submitted no later than 12 noon on December 10, 1992.  Zeidman's worksheet, which memorialized the clearance given to the Ritz for "The Crying" Game, however, had a telefax legend dated November 30, 1992.

7

According to the parties' briefs, the Roxy closed its doors in October of 1994.

On or about August 2, 1993, Orson commenced this action against Miramax. On August 19, 1993, Orson filed an amended complaint in three counts: Count I alleged that Miramax violated section 1 of the Sherman Act by, inter alia, conspiring with the Ritz to exclude the Roxy from the art film market by making the Ritz its "exclusive Philadelphia exhibitor for first-run art film features" and by granting the Ritz "exclusive first-run rights to those of Miramax'[s] films which the Ritz want[ed] to exhibit . . . ."[0] Count II alleged that Miramax violated Pennsylvania's

---

[0] Orson's amended complaint included allegations of additional anticompetitive practices by Miramax. These allegations were abandoned, with the exception of allegations of retaliatory conduct on Miramax's part, which Orson subsequently pursued by way of a motion for injunctive relief. See supra, p. 9. In its motion, Orson relied on Bergen Drug Co. v. Parke, Davis & Co., 307 F.2d 725, 728 (3d Cir. 1962), an antitrust case where we held that a court may grant a preliminary injunction when a party engages in conduct calculated to frustrate litigation, and alleged that Miramax's refusal to grant the Roxy any more licenses, including a license for a subsequent run on "Strictly Ballroom" was retaliatory. The district court denied Orson's motion, finding that Miramax's reason for refusing Orson a license on "Strictly Ballroom" was not solely retaliatory; that Miramax films were not indispensable to Orson's survival; that Orson had delayed asking for preliminary relief; that a preliminary injunction would, under the circumstances, be difficult to administer; that Orson's contention that it would be unable to secure witnesses for trial because of other theaters' fear of retaliation was speculative; that Orson's alleged harm was compensable in money damages; that the preliminary injunction would be oppressive to Miramax; that Orson had not shown that it was likely to succeed on its antitrust claims; and that Orson's request for Miramax films exceeded the status quo. Orson, Inc. v. Miramax Film Corp., 836 F. Supp. 309 (E.D. Pa. 1993).

In this appeal, Orson has also challenged the district court's decision to deny the motion for injunctive relief. This issue, however, is moot, in light both of our decision to uphold

8

"common law doctrine against unreasonable restraint of trade"; and Count III alleged that Miramax violated section 203-7 of Pennsylvania's Feature Motion Picture Fair Business Practices Law, 73 P.S. § 203-1 et seq. (the "Pennsylvania Act") by "consistently grant[ing] the Ritz licenses for its feature art films for exclusive first runs for more than 42 days. . . ."[0]

On October 8, 1993, Orson filed a "Motion for Injunctive Relief to Restore the Status Quo during Pendency of Litigation."  On November 9, 1993, the district court denied Orson's motion, Orson Inc. v. Miramax Film Corp., 836 F. Supp. 309 (E.D. Pa. 1993); on January 12, 1994, the court denied Orson's motion for reconsideration.

On March 22, 1994, Orson filed a motion for partial summary judgment on its common law restraint of trade claim and its Pennsylvania Act claim.  Miramax filed a motion for summary

the court's order granting summary judgment to Miramax on Orson's antitrust claims and of the Roxy's cessation of operations.

[0]        Section 203-7 of Pennsylvania's Feature Motion Picture Fair Business Practices Law, 73 P.S. § 203-1 et seq. (the "Pennsylvania Act"), states:

### § 203-7.  Length of run

> No license agreement shall be entered into between distributor and exhibitor to grant an exclusive first run or an exclusive multiple first run for more than 42 days without provision to expand the run to second run or subsequent run theaters within the geographical area and license agreements and prints of said feature motion picture shall be made available by the distributor to those subsequent run theaters that would normally be served on subsequent run availability.

73 P.S. § 203-7.

9

judgment as to all of Orson's claims on January 4, 1994. On April 5, 1994, Miramax filed a cross-motion for summary judgment on two claims which, according to Miramax, were not set forth in Orson's complaint, but nonetheless discussed in Orson's summary judgment motion, namely, violations of sections 203-4 (bidding) and 203-8 (screening procedures) of the Pennsylvania Act.

On October 5, 1994, the district court denied Orson's motion for partial summary judgment in its entirety. Orson, Inc. v. Miramax Film Corp., 862 F. Supp. 1378, 1390 (E.D. Pa. 1994).

As for Miramax's motion, the district court granted summary judgment to Miramax on both Orson's federal and state antitrust claims.[0] Id. Characterizing the Miramax-Ritz agreement "by which Miramax grant[ed] exclusive licenses to the Ritz for the exhibition of its art films" as "clearly a vertical agreement between a distributor and an exhibitor," the court applied the rule of reason to the "restraint at issue." Id. at 1385-86. Focusing on the competitive effects of the exclusive

_____

[0] On summary judgment, the parties agreed that Pennsylvania's common law against unreasonable restraints of trade follows federal antitrust law. Orson, Inc. v. Miramax Film Corp., 862 F. Supp. 1378, 1381 n.3 (E.D. Pa. 1994). Accordingly, the district court treated Orson's federal and antitrust claims identically. Id. Likewise, in this appeal, Orson briefs only the federal antitrust issues.

Further, since Orson had raised, in the district court's view, an issue for summary judgment by arguing in its brief in opposition to Miramax's motion that the Miramax-Ritz agreement should be declared illegal per se, the court evaluated the parties' submissions as though it had before it cross-motions for summary judgment as to Orson's entire complaint, even though Orson had moved expressly for summary judgment on only its Pennsylvania law claims. Id. at 1382. Orson does not question this aspect of the district court's decision on appeal.

10

licenses, otherwise known in the industry as "clearances," the court concluded that the clearances were reasonable:

> [T]his Court holds that the clearances at issue here are reasonable. First while the clearances stifle intrabrand competition to a small degree--no Miramax art film playing at the Ritz can play contemporaneously at the Roxy, the clearances serve to stimulate competition between art films distributed by Miramax and art films originating with other distributors. As a result, art film-goers in Center City Philadelphia are offered a wider array of selections from which to choose. Further, it is apparent that the Ritz and the Roxy are in substantial competition. By Orson's own admission, the Ritz and the Roxy are the only two art houses in Center City Philadelphia. Thus, if the Ritz and the Roxy were to exhibit the same film on the same dates, not only would the overall degree of choice be reduced, but the Ritz would assuredly lose income as a result. At its core, Orson's complaint asks the Court to compel Miramax to lease its films to Orson for exhibition at the Roxy. The antitrust laws were not enacted to achieve such ends.

Id. at 1386.

With regard to Miramax's summary judgment motion on Orson's section 203-7 Pennsylvania Act claim, the district court concluded that Miramax was not liable for the nine films that were expanded to suburban Philadelphia theaters on or before the forty-third day of their runs at the Ritz, reasoning that section 203-7 only required that Miramax expand the films to other theaters in the Philadelphia area, not to other theaters located within Center City. Id. at 1387-88. As to the six films that were licensed exclusively to the Ritz without expanding to other theaters within 42 days, the court denied Miramax summary

11

judgment, concluding that material issues of fact had been raised as to the existence and terms of the licenses and as to Orson's damages and Miramax's intent.[0]  Id. at 1388.

Finally, agreeing with Miramax that a party may not be granted summary judgment on claims that are not set forth in its complaint, the court granted Miramax's cross-motion for summary judgment.  Id. at 1388-90.  At the same time, however, the court granted Orson leave to amend its complaint to add claims under sections 203-4 and 203-8 of the Pennsylvania Act.  Id. at 1390.

After filing a second amended complaint on October 19, 1994, which added section 203-4 and section 203-8 Pennsylvania Act claims in Counts IV and V respectively, Orson sought certification of the district court's October 5, 1994 order pursuant to 28 U.S.C. § 1292(b).  The court denied Orson's request for certification.

Ultimately, based on its rulings on summary judgment and the parties' stipulation, the district court issued a final

---

[0]    Section 203-10 of the Pennsylvania Act, which covers the actions that an exhibitor may bring for alleged violations of the Act, states:

### § 203-10.  Actions against distributors and exhibitors

Any exhibitor may bring an action against a distributor or exhibitor or both in the respective courts of common pleas wherein the exhibitor's business is located to recover damages sustained by reason of a willful and intentional violation of his act and, where appropriate, shall be entitled to injunctive relief. Such exhibitor, if successful, shall also be awarded the costs of the action include, but not limited to, reasonable attorneys' fees.

73 P.S. § 203-10.

12

order on May 10, 1995, entering judgment in Miramax's favor on Orson's federal and state antitrust claims and on Orson's section 203-7 claim as to the nine films that Miramax distributed on a subsequent-run basis to theaters in the greater metropolitan Philadelphia area. The court's May 10 order also dismissed without prejudice Orson's section 203-4 and 203-8 claims and Orson's section 203-7 claim with respect to the six Miramax films that did not expand to other theaters after showing at the Ritz for 42 days.

This timely appeal by Orson followed. It involves the district court's decision to grant summary judgment to Miramax on Orson's antitrust claims and on Orson's Pennsylvania Act section 203-7 claim with respect to the nine subsequent-run Miramax films that played in Philadelphia theaters located outside of Center City on or before the forty-second day of their first-run at the Ritz,[0] as well as the court's denial of Orson's request for preliminary injunctive relief. We will first address the federal antitrust issues this appeal raises, and the state statutory law question second.

## II.

---

[0] Since the district court's May 10, 1995 order was a final order, 28 U.S.C. § 1291 gives us appellate jurisdiction over this entire case. Thus, our power of review extends not only to that portion of the district court's order which reflects its decision to grant summary judgment to Miramax, but to that portion of its order which reflects its decision to deny Orson's cross-motion for summary judgment as well. International Union, United Mine Workers of America v. Racho Trucking Co., 897 F.2d 1248, 1252 n.2 (3d Cir. 1990).

13

Summary judgment may present the district court with an opportunity to dispose of meritless cases and avoid wasteful trials.  See Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).  This is true even in antitrust cases "`where motive and intent play leading roles, proof is largely in the hands of alleged conspirators, and hostile witnesses thicken the plot.'"  Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1362 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993),(quoting Poller v. Columbia Broadcasting Sys., Inc., 368 U.S. 464, 473 (1962)).

Summary judgment must be granted where no genuine issue of material fact exists for resolution at trial and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  On summary judgment, the moving party need not disprove the opposing party's claim, but does have the burden to show the absence of any genuine issues of material fact. Celotex, 477 U.S. at 322-23.  If the movant meets this burden, then the opponent may not rest on allegations in pleadings, but must counter with specific facts which demonstrate that there exists a genuine issue for trial.  Id. at 323.  When the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the nonmoving party has not offered evidence sufficient to establish the existence of an element essential to its case.  Id. at 322.  We remain mindful that in ruling on a motion for summary judgment, a court must assess the material facts in light of the proof required of the plaintiff on substantive issues.

14

III.

Section 1 of the Sherman Act provides in pertinent part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal." 15 U.S.C. §1. For a section 1 claim under the Sherman Act, "a plaintiff must prove `concerted action,' a collective reference to the `contract . . . combination or conspiracy." Big Apple BMW, 974 F.2d at 1364 (quoting Bogosian v. Gulf Oil Corp., 561 F.2d 434, 445 (3d Cir. 1977), cert. denied, 434 U.S. 1086 (1978)), cert denied, 507 U.S. 912 (1993). A "`unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement'" must exist to trigger section 1 liability. Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771 (1984) (quoting American Tobacco Co. v. United States, 328 U.S. 781, 810 (1946)). In addition to the element of concerted action, a plaintiff must prove that anticompetitive effects were produced within the relevant product and geographic markets; that the objects of the conduct pursuant to the concerted action were illegal; and that it was injured as a proximate result of the conspiracy. Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1229 (3d Cir.), cert. denied, ___ U.S. ___, 114 S. Ct. 554 (1993).

Virtually all business agreements restrain trade to some extent; section 1, therefore, has been construed to make illegal only those contracts that constitute unreasonable

15

restraints of trade.  <u>Business Elecs. Corp. v. Sharp Elecs.</u>
<u>Corp.</u>, 485 U.S. 717, 723 (1988).  Whether a business arrangement
unreasonably restrains trade is determined by the courts, on a
case-by-case basis, using a rule of reason which considers all
relevant factors in examining a defendant's purpose in
implementing the restraint and the restraint's effect on
competition.  <u>Board of Trade of Chicago v. United States</u>, 246
U.S. 231, 238 (1918).[0]  Indeed, the traditional rule of reason

---

[0]     There are certain agreements or practices which
"because of their pernicious effect on competition and lack of
any redeeming virtue are conclusively presumed to be unreasonable
and therefore illegal without elaborate inquiry as to the precise
harm they have caused or the business excuse for their use."
<u>Northern Pacific Ry. Co. v. United States</u>, 356 U.S. 1, 5 (1958).
Such "plainly anticompetitive" agreements are "`illegal <u>per se</u>.'"
<u>National Soc'y of Professional Eng'rs v. United States</u>, 435 U.S.
679, 692 (1978).  Horizontal boycotts have received illegal <u>per</u>
<u>se</u> treatment.  <u>Klor's, Inc. v. Broadway-Hale Stores, Inc.</u>, 359
U.S. 207 (1959).  Although Orson contended in the district court
that Miramax's relationship with the Ritz was illegal <u>per se</u>, and
occasionally speaks of the relationship as a "boycott," it does
not contend in this appeal that the <u>per se</u> rule applies.

     In addition to the traditional rule of reason and the
<u>per se</u> rules, courts sometimes apply what amounts to an
abbreviated or "quick look" rule of reason analysis.  <u>United</u>
<u>States v. Brown Univ.</u>, 5 F.3d 658, 669 (3d Cir. 1993).  This
abbreviated rule applies where <u>per se</u> condemnation is
inappropriate, but where a full-blown industry analysis is not
required to demonstrate the anticompetitive character of an
inherently suspect restraint.  <u>Id.</u>  For example, in cases
involving agreements not to compete in terms of price or output
among members of professional associations, the Supreme Court did
not apply a <u>per se</u> analysis, opting instead for an abbreviated
rule of reason test where "`no elaborate industry analysis [was]
required to demonstrate the anticompetitive character of such an
agreement.'"  <u>FTC v. Indiana Fed'n of Dentists</u>, 476 U.S. 447, 459
(1986)(quoting <u>Professional Eng'rs</u>, 435 U.S. at 692).

     Asserting in its brief that "[t]he restraint's negative
effect on competition is manifest given the abundance of record
evidence showing that the Miramax-Ritz boycott of the Roxy ha[d]
the effect of decreasing output and increasing prices in the

inquiry has essentially remained unchanged since it was first

announced by the Supreme Court in Chicago Board of Trade and

focuses on the competitive significance of the restraint:

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.

Chicago Board of Trade, 246 U.S. at 238.

In rule of reason cases, the plaintiff bears the

initial burden of showing that the alleged combination or

agreement produced adverse, anticompetitive effects within the

relevant product and geographic markets. Brown Univ., 5 F.3d at

668. The plaintiff may satisfy this burden by proving the

existence of actual anticompetitive effects, such as reduction of

output, increase in price, or deterioration in quality of goods

and services. Id. Due to the difficulty of isolating the market

effects of the challenged conduct, however, such proof is often

---

Center City art-film market," Orson suggests that an abbreviated rule of reason market analysis should be used here. Orson failed, however, to substantiate its assertion with facts. We have stated that arguments made in legal memoranda are not evidence. Jersey Cent. Power & Light Co. v. Township of Lacey, 772 F.2d 1103, 1109-10 (3d Cir. 1985), cert. denied, 475 U.S. 1013 (1986). We, therefore, need not consider Orson's suggestion further.

17

impossible to make.  Id.  Accordingly, the courts allow proof of the defendant's "market power" instead.  Id.  Market power -- the ability to raise prices above those that would prevail in a competitive market -- is essentially a "`surrogate for detrimental effects.'"  Id. at 668-69 (quoting FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 460-61 (1986)).

If a plaintiff meets his initial burden of adducing adequate evidence of market power or actual anticompetitive effects, the burden shifts to the defendant to show that the challenged conduct promotes a sufficiently pro-competitive objective.  Id. at 669.  To rebut, the plaintiff must demonstrate that the restraint is not reasonably necessary to achieve the stated objective.  Id.

Agreements between entities at different market levels are termed "vertical restraints."  See United States v. Topco Assocs., Inc., 405 U.S. 596, 608 (1972).  The Supreme Court has instructed that vertical restraints of trade, which do not present an express or implied agreement to set resale prices, are evaluated under the rule of reason.  Business Elec. Corp., 485 U.S. at 724; see also Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36 (1977).

The Supreme Court has also repeatedly confirmed in vertical restraint cases that interbrand competition, as opposed to intrabrand competition, is the primary goal of the antitrust laws.  Tunis Bros. Co. v. Ford Motor Co., 952 F.2d 715, 722-23 (3d Cir. 1991) (citing Business Elecs. Corp., 485 U.S. 717, and Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752 (1984), and

18

GTE Sylvania, 433 U.S. at 36), cert. denied, 505 U.S. 1221

(1992).[0]

IV.

We now address the antitrust issues raised by the

business arrangement in this case.  We note at this point that

Miramax conceded for purposes of summary judgment that the

relevant product market was art films and that the relevant

---

[0]     In Continental T.V., Inc. v. GTE Sylvania, Inc., 433
U.S. 36 (1977), a television manufacturer entered into franchise
agreements which prohibited the sale of its products from other
than specified locations.  Discussing the application of the rule
of reason to vertical restraints, the Supreme Court explained the
difference between interbrand and intrabrand competition:

> Interbrand competition is the
> competition among the manufacturers of the
> same generic product -- television sets in
> this case -- and is the primary concern of
> antitrust law.  The extreme example of a
> deficiency of interbrand competition is
> monopoly, where there is only one
> manufacturer.  In contrast, intrabrand
> competition is the competition between the
> distributors -- wholesale or retail -- of the
> product of a particular manufacturer.
>      The degree of intrabrand competition is
> wholly independent of the level of interbrand
> competition confronting the manufacturer.
> Thus, there may be fierce intrabrand
> competition among the distributors of a
> product produced by a monopolist and no
> intrabrand competition among the distributors
> of a product produced by a firm in a highly
> competitive industry.  But when interbrand
> competition exists, as it does among
> television manufacturers, it provides a
> significant check on the exploitation of
> intrabrand market power because of the
> ability of consumers to substitute a
> different brand of the same product.

Id. at 52 n.19.

19

geographic market was Center City, Philadelphia. Our evaluation of Orson's antitrust claim, therefore, proceeds on this basis.

The first issue we consider is the precise nature of the agreement between Miramax and the Ritz. Orson alleges in its second amended complaint that Miramax committed to make the Ritz its "exclusive Philadelphia exhibitor for first-run art film features. . . ." Based on our careful review of the evidence, we disagree. The record is devoid of any proof of a promise on Miramax's part that it would grant first-run licenses on its films in Center City to the Ritz only. Moreover, the evidence is to the contrary; the Roxy received a first-run license from Miramax, as did the theaters operated in Center City by United Artists and American Multi-Cinema. The record shows, instead, a series of clearances granted by Miramax to the Ritz, based on an understanding between the parties' respective principals that any time the Ritz was showing a first-run Miramax film, its license would be exclusive.

Before we consider the antitrust significance of the clearances, however, we will address the alleged conspiracy that we believe lies at the heart of Orson's second amended complaint. As we understand it, Orson's antitrust theory does not primarily challenge the clearances themselves; but rather, claims that the clearances were mere vehicles that Miramax and the Ritz used to further a secret conspiracy to drive the Roxy out of business by denying that theater first-run Miramax films.

A.

Our evaluation of Orson's allegations concerning a scheme on the part of Miramax and the Ritz to destroy the Roxy is controlled by our decision in Houser v. Fox Theaters Management Corp., 845 F.2d 1225 (3d Cir. 1988). There the owners of the Colonial Theater (the "Housers") brought an antitrust action against several motion picture distributors and the owners of the Fox Theaters ("Fox"), alleging, inter alia, that each of the distributor defendants violated section 1 of the Sherman Act by conspiring individually with Fox to deny the Colonial first-run films. Id. at 1229. To support this claim, we required the Housers to present "direct or circumstantial evidence that reasonably tend[ed] to prove the alleged conspirators `had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" Id. at 1232 (quoting Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 (1984)). We further instructed that in doing so, the Housers had to show "'(1) that the defendants acted in contradiction of their economic interests, and (2) that the defendants had a motive to enter into an agreement.'" Id. (quoting Schoenkopf v. Brown & Williamson Tobacco Corp., 637 F.2d 205, 208 (3d Cir. 1980)).

As to our first enumerated element, the Housers asserted that the distributors had acted against their economic interests by consistently choosing to license films to the Fox Theaters rather than the Colonial. They argued that "`[o]n a purely objective basis, the Colonial was a better theater than any of the five Fox theaters'" in view of its "large seating capacity, elegant and well-maintained condition, and its location

21

in a nice section of downtown in contrast to the alleged `dark and dingy' quality of the narrow suburban twin theaters and the downtown theater owned by Fox." Id. at 1232. Despite the Housers' assertion, we held that there was not sufficient evidence of record to permit a factfinder to conclude that the distributor defendants had acted contrary to their economic interests; we affirmed the order of the district court granting the defendants summary judgment. Id. at 1233. We observed that "the decision to license a picture to one theater rather than another is based on a complicated subjective estimation of a theater's grossing potential" and that the courts have recognized that "motion picture distributors have broad discretion to make licensing decisions based on their own independent judgments." Id. at 1232. Pointing out that the Housers' argument failed for emphasizing just a few of the factors that a distributor considers in making its licensing decision while ignoring others, we stated that "[s]uch factors as a proven track record of high box office receipts and an unblemished payment history are as important as the seating capacity or aesthetic qualities of a theater when estimating its grossing potential." Id. at 1232. We also concluded that the Housers did not substantiate their allegations that the distributors conspired with Fox because they feared that Fox would use its "circuit power" and refuse to do business with them. Id. at 1233. We, therefore, further held that even if the distributors had acted contrary to their economic interests, the Housers failed to present evidence to support the second essential element we had articulated, namely,

22

that the distributors were motivated to conspire individually with Fox.  Id.

Orson makes similar assertions here.  It contends that given its willingness to pay a higher percentage of the Roxy's gross for first-run Miramax films than paid by the Ritz, Miramax acted contrary to its economic well-being by choosing to grant clearances to the Ritz; it further maintains that Miramax was coerced into favoring the Ritz because the Ritz had made it clear that unless it was granted an exclusive arrangement it would use its clout and refuse to play Miramax films.

We do not find sufficient evidence in the record for either assertion.  To the contrary, the evidence establishes that the clearances were consistent with Miramax's business interests, granted by the distributor to, as between the Roxy and the Ritz, the theater it reasonably predicted would generate greater income.  The record demonstrated that the Ritz had ten screens at two locations with seating capacities of 1,125 and 710 respectively, while the Roxy had two screens with a seating capacity of 130 each.  The Ritz had a solid history of box office receipts; by comparison, the Roxy was not nearly as profitable.  The theaters which comprised the Ritz had been in continuous operation since their inception; the Roxy, on the other hand, had ceased operations from time to time over the years.  The Ritz marketed the films it exhibited and was known to have outstanding sound and projection equipment.  Simply put, "[i]n light of the broad discretion that must be given to film distributors in making complex licensing decisions," id. at 1233, Orson's

23

position, premised solely on the financial terms of its offer, is insufficient to call into question the wisdom of Miramax's decision. We, therefore, hold that the evidence in the record is insufficient to permit the factfinder to conclude that Miramax acted contrary to its self-interest by choosing to license exclusively to the Ritz rather than the Roxy.

Moreover, the deposition testimony that Orson offered to support its assertion that the Ritz had unduly pressured Miramax in its licensing decisions, even when viewed in Orson's favor, shows nothing of the kind. The testimony of Raymond Posel and Martin Zeidman demonstrates only that there existed a mutual understanding between the representatives of Miramax and the Ritz that the Ritz first-run licenses on Miramax films would be exclusive. Thus, we also conclude that Orson failed to show that Miramax had a motive to conspire with the Ritz to drive the Roxy out of business.

Lastly, we observe that Orson expended considerable effort describing the "trade screening charade" and the "sham bidding" in which Miramax and the Ritz allegedly engaged, contending that these practices were perpetuated by the parties to conceal their unlawful scheme. We have concluded, however, that Orson failed to present sufficient evidence to show that Miramax and the Ritz conspired to drive the Roxy from the market; we need not, therefore, consider Orson's allegations of a cover-up on their part. Further, Orson's assertions about improper bidding, without more, lack antitrust significance in this case. As we recognized in Sitkin Smelting & Refining Co. v. FMC Corp.,

24

575 F.2d 440 (3d Cir.), cert. denied, 439 U.S. 866 (1978), "`the Sherman Act is neither a lowest-responsible-bidder statute nor a panacea for all business affronts which seem to fit nowhere else.'" Id. at 448 (citation omitted).[0]

Therefore, we conclude that Orson failed to sustain its burden on summary judgment regarding the essential elements of its antitrust conspiracy claim.

B.

Our inquiry does not end here. The fact remains that clearances existed between Miramax and the Ritz, and that Orson contends that they violated section 1 of the Sherman Act.

We begin our analysis of this aspect of Orson's case with a general discussion of clearances. We first observe that clearances, which involve entities at different levels of the

---

[0] We do not suggest that allegations concerning the bidding process lack antitrust significance in all contexts. For example, in Movie 1 & 2 v. United Artists Communications, 909 F.2d 1245 (9th Cir. 1990), cert. denied, 502 U.S. 1030 (1991) and 502 U.S. 1039 (1992), the plaintiff, a movie theater, alleged that two competing motion picture exhibitors and 19 national film exhibitors participated in an illegal "split agreement" in violation of Section 1 of the Sherman Act. In the motion picture industry, a split agreement is "an exhibitor agreement which divides a normally competitive market by allocating films to particular members for licensing rights to the films assigned." Id. at 1248. On summary judgment, the plaintiff submitted evidence which indicated that the distributor-defendants refused to receive any bids from the plaintiff for first-run films, that the exhibitor-defendants did not bid against one another and that the exhibitor-defendants earned respectively about 96.9% and 69.9% of all revenues in the relevant market. Id. at 1251. Under these circumstances, the Court of Appeals for the Ninth Circuit held that the plaintiff presented a triable issue on its Section 1 claim of a conspiracy to restrain trade in the form of a group boycott through split agreements. Id. at 1252.

25

film distribution industry, are vertical, nonprice restraints of trade. See Theee Movies of Tarzana v. Pacific Theatres, Inc., 828 F.2d 1395, 1399 (9th Cir. 1987), cert. denied, 484 U.S. 1066 (1988); see also United States v. Paramount Pictures, Inc., 334 U.S. 131 (1948). As such, they are subject under section 1 to a rule of reason analysis. Three Movies of Tarzana, 828 F.2d at 1399.

Clearances have undergone antitrust scrutiny. Some time ago, in Paramount Pictures, 334 U.S. 131, the Supreme Court reviewed a district court decree which resolved an antitrust action brought by the Department of Justice against several producers, distributors and exhibitors of motion pictures for various Sherman Act violations, including the maintenance of a system of allegedly unlawful clearances. Affirming the district court's decision to enjoin the defendants from continuing their clearance practices, the Court approvingly referenced the district court's view that clearances are justified by "the assurance they give the exhibitor that the distributor will not license a competitor to show the film either at the same time or so soon thereafter that the exhibitor's expected income from the run will be greatly diminished," as well as the court's conclusion that reasonable clearances require that the theaters involved substantially compete. Id. at 144-47.[0]

---

[0] The clearances at issue in United States v. Paramount Pictures, 334 U.S. 131 (1948), involved, inter alia, five major defendants which produced motion pictures and their respective subsidiaries or affiliates which distributed and exhibited films. The evidence showed that the clearances were not typical, bearing no relation to the competitive factors which usually justify

More recently, in <u>Theee Movies of Tarzana</u>, 828 F.2d 1395, the Court of Appeals for the Ninth Circuit considered whether certain clearances were reasonable restraints of trade under the circumstances presented.  There the owner of a movie theater ("TMT") brought suit against a competing exhibitor ("Pacific") and several movie distributors, alleging that first-run clearances granted to Pacific's Galleria Theater by the distributors violated section 1 of the Sherman Act.  The district court granted summary judgment to the defendants; the court of appeals affirmed, noting that the courts have acknowledged over the years that "`the whole system of runs and clearances . . . purposely, and legitimately, discriminates between competing exhibitors.'"  <u>Id.</u> at 1399 (citations omitted).  After initially observing that the reasonableness of a particular restraint depends upon an understanding of the industry at issue and a balancing of the restraint's positive and negative effects on
_____

them.  <u>Id.</u> at 146.  By way of illustration, the Court set forth the following finding of the district court:

> "Some licenses granted clearance to sell to all theatres which the exhibitor party to the contract might thereafter own, lease, control, manage, or operate against all theatres in the immediate vicinity of the exhibitor's theatre thereafter erected or opened.  The purpose of this type of clearance agreements was to fix the run and clearance status of any theatre thereafter opened not on the basis of its appointments, size, location, and other competitive features normally entering into such determination, but rather upon the sole basis of whether it were operated by the exhibitor party to the agreement."

<u>Id.</u> at n.7.

27

competition, the court of appeals concluded that although the clearances the Galleria received reduced intrabrand competition to a minor degree, they "also encouraged interbrand competition by forcing TMT to find alternative subrun movies to exhibit and to promote." Id. at 1399. Considering next the relationship between the Galleria and TMT, the court determined that in view of the fact that the theaters competed, the clearances reflected a reasonable business decision on both sides of the transaction:

> Because the two theaters were in substantial competition, Pacific [the exhibitor] was properly concerned that exhibiting first runs at TMT's theater simultaneously with the Galleria would diminish the Galleria's income. Pacific wanted to recoup its investment in the Galleria and advertising, rather than allow TMT's theater to "free ride" on its advertising.
>
> The distributors had a legitimate business interest in the revenue generated by the theaters they licensed, because the distributors were paid, in part, out of each movie's gross profits. The distributors wished to reach the largest number of viewers with the smallest number of movie prints, to recoup quickly their own investment.

Id. at 1399-40 (citations omitted).

Guided by applicable rules of federal antitrust law and the cases we have reviewed, we conclude that the reasonableness of a clearance under section 1 of the Sherman Act depends on the competitive stance of the theaters involved and the clearance's effect on competition, especially the interbrand competition which, as the Supreme Court has instructed, is our primary concern in an antitrust action.

28

Applying these criteria to the clearances before us, we begin with the fact that the parties agreed that the Roxy and the Ritz were in competition. Thus, the clearances served their accepted purpose of assuring both Miramax and the Ritz that the return from one run of a particular Miramax film would not be diminished.

Turning to the touchstone of the rule of reason, the clearances' competitive effects, the uncontroverted facts of record reveal a market in which competition thrived at both the distributor and exhibitor levels. In Center City, the Roxy, the Ritz, and the theaters owned by United Artists and American Multi-Cinema vied for the films of at least 59 distributors. Indeed, it is the indisputable existence of alternative sources of supply for the Roxy which negates the existence of anticompetitive effects in this case. Although the Miramax-Ritz clearances most certainly reduced intrabrand competition to some degree by disallowing the Roxy from showing on a first-run basis any Miramax film that the Ritz had selected, they undeniably promoted interbrand competition by requiring the Roxy to seek out and exhibit the films of other distributors, which it consistently accomplished. Thus, in our view, the record conclusively establishes that the clearances did not produce the anticompetitive effects the Sherman Act was designed to prevent. On the contrary, competition in the relevant market was enhanced; art film consumers in Center City had more movies from which to choose. In an apparent attempt to avoid this absence of proof on an essential element of its case, Orson alluded in its brief to

29

Miramax's having market power, arguing that the distributor had "enormous financial clout" and "solidified its leading position among independent film distributors" subsequent to its acquisition by the Walt Disney Company in 1993.  Orson did not, however, present a factual basis for this belief.  As we have stated, "[l]egal memoranda and oral argument are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion."  <u>Jersey Cent. Power & Light Co. v. Township of Lacey</u>, 772 F.2d 1103, 1109 (3d Cir. 1985), <u>cert.</u> <u>denied</u>, 475 U.S. 1013 (1986).⁰

We thus conclude that Orson failed to present sufficient evidence to support its claim that the Miramax–Ritz clearances were unreasonable restraints of trade.

V.

We turn now to Orson's state law claim brought under section 203-7 of the Pennsylvania Act.  Orson alleges that Miramax violated 73 P.S. § 203-7 when it expanded the runs of

⁰ Miramax contends that Orson also failed to show that it suffered antitrust injury.  Since Orson did not meet its burden of presenting sufficient evidence to demonstrate that competition was suppressed, we need not address this issue.

We also note that Orson did not allege nor did it present evidence to show that Miramax was a monopolist or that <u>only</u> <u>Miramax</u> films constituted the relevant product market.  <u>See</u> <u>Tunis Bros. Co. v. Ford Motor Co.</u>, 952 F.2d 715, 723 (3d Cir. 1991) ("[I]t is also true that a well-defined submarket may constitute a relevant product market and so under certain circumstances a relevant product market could consist of one brand of a product, placing intrabrand competition at issue."), <u>cert.</u> <u>denied</u>, 505 U.S. 1221 (1992).  We make these points because Orson's antitrust theory frequently seemed premised on an analysis of a market which was limited to Miramax's product.

30

nine films that had played exclusively at the Ritz for 42 days or less to theaters located in the suburbs of Philadelphia, but not to other Center City theaters.

Section 203-7 provides in pertinent part that "[n]o license agreement shall be entered into between distributor and exhibitor to grant an exclusive first run or an exclusive multiple first run for more than 42 days without provision to expand the run to second run or subsequent run theaters <u>within the geographical area</u> . . . ."  73 P.S. § 203-7 (emphasis added).

On summary judgment, Miramax argued that it complied with section 203-7 because the relevant "geographical area" as contemplated by section 203-7 was the greater Philadelphia metropolitan area; Orson, by contrast, contended that the expansions to suburban theaters were legally irrelevant because section 203-7 required that Miramax expand the run of each film it licensed exclusively to the Ritz to theaters located within the geographical area covered by the license, namely, Center City.[0]

---

[0]     Believing that Orson is "apparently contending that [s]ection 203-7 compels distributors to terminate a first run at one theater, such as the Ritz, after 42 days and open another run at a competing theater, such as the Roxy," Miramax argues that, if interpreted this way, the Pennsylvania Act would be preempted by the Federal Copyright Act, 17 U.S.C. §§ 101-914.  Orson, however, states in its reply brief that it does not maintain that section 203-7 compels distributors to terminate a first run at one theater and appears to argue that section 203-7 would only require that another theater in the relevant geographic area be permitted to share in the run after 42 days.  In the trade, a first-run "day and date" refers to the first-run exhibition of a film by two theaters at the same time.  <u>Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.</u>, 346 U.S. 537, 539 n.7 (1954).

31

The district court found section 203-7's wording "sufficiently vague" to permit these alternative interpretations. <u>Orson Inc. v. Miramax Film Corp.</u>, 862 F. Supp. 1378, 1387 (E.D. Pa. 1994). Noting that one of the purposes of the Pennsylvania Act is to "`promote the wide geographical dissemination at reasonable prices to the public of ideas, opinions and artistic expression in feature motion pictures,'" 73 P.S. § 203-2(4), and that another identified purpose of the Act is to "`foster vigorous and healthy competition'" in the film business, <u>id.</u> §203-2(3), the court agreed with Miramax and held that since the Pennsylvania legislature's "primary purpose in enacting section 203-7 was not to increase market rivalry among direct competitors, but instead to promote the wide distribution of movies throughout Pennsylvania[,] . . . Miramax can incur no 203-7 liability for the 9 films that were expanded to other Philadelphia area theaters on or before the forty-third day of their runs at the Ritz." <u>Id.</u> (footnote omitted).

---

At any rate, we have already rejected a facial challenge to section 203-7 under the Copyright Act, holding that "the Act on its face contains no threat to the copyrights themselves . . . ." <u>Associated Film Distribution Corp. v. Thornburgh</u>, 683 F.2d 808, 816 (3d Cir. 1982), <u>cert. denied</u>, 480 U.S. 933 (1987). <u>See Associated Film Distribution Corp. v. Thornburgh</u>, 800 F.2d 369, 377 (3d Cir. 1986), <u>cert. denied</u>, 480 U.S. 933 (1987) ("There may be merit to the distributors' argument that the 42-day provision, when construed as limiting the distributors' right to license an exclusive run to 42 days, is preempted by the Copyright Act. However, such preemption would be apparent on the face of the statute and cannot be reconciled with [our] earlier decision [in <u>Associated Films</u>, 683 F.2d at 816] that the Act is not facially invalid under the Copyright Act.").

The Pennsylvania Supreme Court has not interpreted section 203-7. We, therefore, must predict how the Court would interpret and apply that section. Borman v. Raymark Indus. Inc., 960 F.2d 327, 331 (3d Cir. 1992). Unfortunately, there are no intermediate appellate court decisions to assist us.[0]

Pennsylvania abides by well-known rules of statutory construction. When construing a statute, the Pennsylvania courts must ascertain and effectuate the Pennsylvania Legislature's intent. 1 Pa. Cons. Stat. Ann. § 1921(a); Commonwealth v. Lopez, 444 Pa. Super. 206, 663 A.2d 746, 748 (1995). The courts' "starting point is the language therein, absent any evidence to the contrary. A statute's plain meaning must prevail." Retenauer v. Flaherty, 164 Pa. Commw. 182, 191, 642 A.2d 587, 591 (1994); 1 Pa. Cons. Stat. Ann. § 1921(a). Any word or phrase, not otherwise defined, must be construed according to the rules of grammar and according to the common and approved usage. 1 Pa. Cons. Stat. Ann. § 1903(a); Martin Media v. Commonwealth, ___ Pa. Commw. ___, 661 A.2d 479, 481 n.2 (1995). Further, the letter of

---

[0] When a federal district court exercises diversity jurisdiction, it must apply the substantive law as decided by the highest court of the state whose law governs the action. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Commercial Union Ins. Co. v. Bituminous Casualty Corp., 851 F.2d 98, 100 (3d Cir. 1988). When the state's highest court has not addressed the precise question presented, a federal court must predict how the state's highest court would resolve the issue. Borman v. Raymark Indus., Inc., 960 F.2d 327, 331 (3d Cir. 1992). Although not dispositive, decisions of state intermediate appellate courts should be accorded significant weight in the absence of an indication that the highest state court would rule otherwise. See Rolick v. Collins Pine Co., 925 F.2d 661, 664 (3d Cir. 1991), cert. denied, 507 U.S. 973 (1993). Our review of the district court's prediction and application of state law is plenary. Borse v. Piece Goods Shop, Inc., 963 F.2d 611, 613 (3d Cir. 1992).

the statute is not to be disregarded under the pretext of pursuing its spirit, 1 Pa. Cons. Stat. Ann. § 1921(b), and the courts may not insert language into a statutory provision where the legislature has failed to supply it. Key Savings and Loan Ass'n v. Louis John, Inc., 379 Pa. Super. 226, 232, 549 A.2d 988, 991 (1988). The courts should give effect to all sections of an act rather than interpreting the language in such a way that one clause is rendered superfluous or meaningless for the benefit of another. 1 Pa. Cons. Stat. Ann. § 1921(a); Key Savings and Loan Ass'n, 379 Pa. Super. at 232, 549 A.2d at 991. Finally, when a word or phrase is ambiguous, the courts must look beyond the statutory language and attempt to ascertain the intention of the legislature by reference to various statutory factors, including the occasion and necessity for the statute, the circumstances of its enactment; the mischief it remedies; the object it seeks to attain; former law; the consequences of a particular interpretation; contemporaneous legislative history; and legislative and administrative interpretations of the statute. 1 Pa. Cons. Stat. Ann. § 1921(c).

With these principles in mind, we conclude that the district court's interpretation of section 203-7 is erroneous. Although section 203-7 may be less than clear in certain respects, it is not ambiguous as to where an exclusive first-run license must provide for expansion. We believe that as a matter of simple semantics, the statute's "within the geographical

area"[0] phrase can only refer to the place where the license was granted in the first place.  In our view, when the district court interpreted section 203-7 to sanction expansion to theaters outside of Center City, the plain meaning of the statute's language was distorted since the word "within" in that phrase was ignored.  Moreover, in referring to the Act's expressed purposes to support its interpretation, the court overlooked the purpose which reflects the Pennsylvania Legislature's intention to limit, as Orson argues, the length of first-run licenses in the very areas they cover:

> [to] benefit the movie going public by limiting the long and extensive first runs so that additional theaters, in a given area, may also exhibit the same feature motion picture and at possibly a lower admission price . . . .

73 P.S. § 203-2(9).

We therefore conclude that section 203-7 prohibits a distributor and exhibitor from entering into a license agreement which grants an exclusive first-run for more than 42 days without providing for expansion in the same geographic area covered by

---

[0]     We note that the Pennsylvania Act does not define "geographical area".  The Act, however, defines "Run" in section 203-3 as "[t]he continuous exhibition of a feature motion picture in a defined geographical area for a specified period of time." 73 P.S. § 203-3 (emphasis added).  Section 203-7, unlike section 203-3, does not have the word "defined" before "geographical area."  This omission does not change our analysis, even though a Pennsylvania rule of statutory construction provides that "where a section of a statute contains a given word, the omission of such word from a similar section of the statute shows a different legislative intent." Commonwealth v. Berryman, 437 Pa. Super. 258, 267, 649 A.2d 961, 965 (1994).  This single rule cannot overcome what we see as the plain meaning of section 203-7 and the Pennsylvania Legislature's intent in enacting it.

the license.  Because the record is either disputed or incomplete in critical respects, however, we cannot resolve Orson's section 203-7 claim on summary judgment.  Further proceedings are necessary to resolve, for example, the length of run and expansion terms, if any, of the licenses; the availability of license agreements and film prints, if relevant, to subsequent run theaters; Orson's damages; and Miramax's intent.  See 73 P.S. §§ 203-7, 203-10.

Thus, we conclude that Miramax was not entitled to summary judgment on Orson's section 203-7 Pennsylvania Act claim.

VI.

For the foregoing reasons, we will affirm the district court's grant of summary judgment on Counts I and II of the second amended complaint in Miramax's favor.  We will vacate the district court's order granting summary judgment to Miramax on Count III as to the nine films that expanded to Philadelphia theaters outside of Center City on or before the forty-second day of their runs at the Ritz and remand for further proceedings on Orson's claim that Miramax's actions as to these nine films violated section 203-7 of the Pennsylvania Act.[0]

---

[0]     Each party is entitled to the costs it incurred on those claims on which it prevailed on appeal.  The parties shall notify the Clerk's Office if they are unable to resolve this division of costs between themselves.