JOURNAL PUBLISHING COMPANY, INC. *v.*
THE HARTFORD COURANT COMPANY
(SC 16677)

Sullivan, C. J., and Borden, Katz, Vertefeuille and Zarella, Js.

Argued April 16—officially released September 17, 2002

*William M. Rubenstein,* with whom were *Michelle H. Seagull* and, on the brief, *Chad A. Landmon,* for the appellant (defendant).

*Richard P. Weinstein*, with whom was *Nathan A. Schatz*, for the appellee (plaintiff).

*Opinion*

SULLIVAN, C. J. The plaintiff, Journal Publishing Company, Inc., filed this petition for a bill of discovery pursuant to General Statutes § 52-156a (a),[1] seeking dis-

[1] General Statutes § 52-156a (a) provides: "(1) A person who desires to perpetuate testimony regarding any matter that may be cognizable in the Superior Court may file a verified petition in the superior court for the judicial district of the residence of any expected adverse party. The petition shall be entitled in the name of the petitioner and shall show: (A) That the petitioner expects to be a party to an action cognizable in the superior court but is presently unable to bring it or cause it to be brought, (B) the subject matter of the expected action and the petitioner's interest therein, (C) the facts which the petitioner desires to establish by the proposed testimony and the reasons for desiring to perpetuate it, (D) the names or a description of the persons the petitioner expects will be adverse parties and their addresses so far as known, and (E) the names and addresses of the persons to be examined and the substance of the testimony which the petitioner expects to elicit from each, and shall ask for an order authorizing the petitioner to take the depositions of the persons to be examined named in the petition, for the purpose of perpetuating their testimony.

"(2) The petitioner shall thereafter serve a notice upon each person named in the petition as an expected adverse party, together with a copy of the petition, stating that the petitioner will apply to the court, at a time and place named therein, for the order described in the petition. At least twenty days before the date of hearing the notice shall be served in the manner provided by section 52-57; but if such service cannot with due diligence be made upon any expected adverse party named in the petition, the court may make such order as is just for service by publication or otherwise, and shall appoint, for persons not served in the manner provided by section 52-57, an attorney who shall represent them, and, in case they are not otherwise represented, shall cross-examine the deponent.

"(3) If the court is satisfied that the perpetuation of the testimony may prevent a failure or delay of justice, it shall make an order designating or describing the persons whose depositions may be taken and specifying the subject matter of the examination and whether the depositions shall be taken upon oral examination or written interrogatories. The depositions may then be taken in accordance with this section; and the court may make orders for the production of documents and things and the entry upon land for inspection and other purposes, and for the physical or mental examination of persons. For the purpose of applying this section to depositions for perpetuating testimony, each reference in this section to the court in which the action is pending shall be deemed to refer to the court in which

covery of certain information from the defendant, The Hartford Courant Company. Following a court trial, the trial court determined that there was probable cause to believe that the plaintiff had a cause of action against the defendant for: (1) tortious interference with a contract; (2) antitrust violations; and (3) violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. Accordingly, the trial court granted the petition in part and ordered the defendant to provide certain information to the plaintiff. This appeal followed. We conclude that the plaintiff has not established probable cause to support any of the causes of action found by the trial court and, accordingly, reverse the judgment.

The record reveals the following relevant facts and procedural history. On September 5, 2000, the plaintiff filed a petition to perpetuate testimony, to conduct depositions and to order production of documents before action. The plaintiff claimed in its petition that there was probable cause to believe that the defendant wrongfully had excluded the plaintiff from the market for Sunday comic strips in violation of General Statutes §§ 35-26[2] and 35-28 (b)[3] and (d) and had engaged in an unfair method of competition and an unfair act or

---

the petition for such deposition was filed.

"(4) If a deposition to perpetuate testimony is taken under this section, it may be used in any action involving the same subject matter subsequently brought in the Superior Court."

[2] General Statutes § 35-26 provides: "Every contract, combination, or conspiracy in restraint of any part of trade or commerce is unlawful."

[3] General Statutes § 35-28 provides: "Without limiting section 35-26, every contract, combination, or conspiracy is unlawful when the same are for the purpose, or have the effect, of: (a) Fixing, controlling, or maintaining prices, rates, quotations, or fees in any part of trade or commerce; (b) fixing, controlling, maintaining, limiting, or discontinuing the production, manufacture, mining, sale, or supply of any part of trade or commerce; (c) allocating or dividing customers or markets, either functional or geographical, in any part of trade or commerce; or (d) refusing to deal, or coercing, persuading, or inducing third parties to refuse to deal with another person."

practice in the conduct of the trade or commerce of selling or distributing newspapers in violation of General Statutes § 42-110b.[4] Accordingly, the plaintiff sought to examine all documents between the defendant and certain national syndicators of the comic strips regarding the distribution of the Sunday comics, and to conduct a deposition of a representative of the defendant's newspaper regarding the same issue.

On March 2, 2001, the trial court held a hearing on the plaintiff's petition. Elizabeth Ellis gave the following testimony on behalf of the plaintiff. The plaintiff publishes a newspaper, the Journal Inquirer, which is circulated in seventeen towns in Connecticut and Massachusetts. Ellis has been the newspaper's publisher for thirty years. The defendant publishes a newspaper, the Hartford Courant, which also is circulated in those seventeen towns. The Journal Inquirer is published on Monday through Friday in the afternoon and on Saturday in the morning and contains three pages of nationally syndicated comic strips. The Hartford Courant is published seven days a week and contains eleven syndicated comic strips that are published also by the Journal Inquirer. Ellis testified, on the basis of her knowledge of the newspaper business, that newspapers that publish comic strips have written agreements with the syndicators of the comic strips.

The Journal Inquirer receives its comic strips from the syndicators on a daily basis. Each comic strip is printed with a release, or expected publication, date. The Journal Inquirer considers itself contractually bound to honor those dates.

Over the course of a number of years prior to the year 2000, Ellis made several unsuccessful attempts on

---

[4] General Statutes § 42-110b provides in relevant part: "(a) No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ."

behalf of the plaintiff to acquire from certain syndicators the right to publish the Sunday edition of their comics. The plaintiff intended to publish the Sunday comics either in a Sunday newspaper or in a "weekend edition" that would be published on Saturday morning and would have certain features of a Sunday newspaper.

At some point in the year 2000, the Hartford Courant ran an advertisement indicating that the Sunday edition of that newspaper soon would be available on Saturdays. When Ellis became aware of that fact, she called the syndicators of certain comic strips in another attempt to obtain the right to publish the Sunday comics. When she was unable to do so, she wrote a letter to the defendant requesting that it release the exclusivity provisions of its contracts with the syndicators of nine Sunday comic editions and permit the syndicators to distribute the comics to the plaintiff.[5] The defendant's parent corporation acknowledged receipt of the letter and indicated that it would respond after it had had an opportunity to look into the matter. The plaintiff received no further response to Ellis' letter.

Ellis also telephoned Walter Mahoney, the vice president of one of the syndicators, Tribune Media, to inquire why the Journal Inquirer was restricted from publishing the Sunday comics on Saturday when the Hartford Courant was permitted to to do so. Ellis was not successful in her attempt to persuade Mahoney to allow the plaintiff to publish the Sunday comics.

On the day before the hearing on the plaintiff's petition, Ellis telephoned the publisher of the Hartford Courant, Jack Davis, to ask why the defendant objected to the Journal Inquirer's publishing the same Sunday comics that the Hartford Courant published in its early Sunday edition. Davis responded that it was important

[5] We note that the defendant claims that the existence of such exclusivity provisions was not established by the evidence presented at the hearing.

for the Hartford Courant to have a unique product so that people would want to buy that newspaper rather than another.

On cross-examination, Ellis testified that Editor & Publisher magazine contains a list of the Sunday comics that are available for publication from syndicators. That magazine lists more than 200 syndicated Sunday comics.

Following the hearing, the trial court found that the defendant had contracts with the syndicators that it had amended at some point to allow it to publish Sunday comic strips on Saturday, prior to their release date. It also found that, under the terms of the amended contracts, the syndicators had agreed not to permit the plaintiff to publish the Sunday comic strips on Saturday. Finally, it found that both the defendant and one of the syndicators had acknowledged to the plaintiff the existence of such a preclusive contractual provision.

The trial court also concluded that the plaintiff had established that there was probable cause to believe that the defendant had: (1) modified its contract with the syndicators with the intention of limiting the plaintiff's contractual rights; (2) violated CUTPA by engaging in unscrupulous or oppressive acts; and (3) persuaded the syndicators to refuse to deal with the defendant in violation of the antitrust statutes. Accordingly, the trial court rendered judgment for the plaintiff and ordered the defendant to disclose the portion of its contracts with the syndicators who also contracted with the plaintiff governing the publication of Sunday comics. The defendant appealed from that judgment to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

The defendant claims on appeal: (1) that the trial court's findings of fact were not supported by the evi-

dence presented at the hearing; and (2) that, in reaching its legal conclusions, the trial court misconstrued and misapplied the legal standard for granting a bill of discovery. The plaintiff contends, to the contrary, that the evidence supported the trial court's factual findings. It further contends that the record is inadequate for review of the trial court's legal conclusions. The plaintiff also argues, however, that, even if the court's conclusions are reviewable, the defendant's challenge to those conclusions is without merit. Finally, the plaintiff argues that, if this court reverses the judgment of the trial court, it should remand the case for a new hearing at which the plaintiff should be permitted to subpoena and examine a representative of the defendant to obtain additional factual support for its claims.

We conclude that the evidence presented at the March 2, 2001 hearing was sufficient to support the factual findings on which the trial court relied in reaching its legal conclusions. We also conclude, however, that those factual findings were insufficient to support a finding of probable cause that the plaintiff had a cause of action against the defendant on the grounds alleged in its petition. Accordingly, we reverse the judgment of the trial court. We also conclude that the plaintiff is not entitled to a new hearing.

Before examining the merits of the defendant's claims, "a brief discussion of the bill of discovery is appropriate. The bill of discovery is an independent action in equity for discovery, and is designed to obtain evidence for use in an action other than the one in which discovery is sought. . . . As a power to enforce discovery, the bill is within the inherent power of a court of equity that has been a procedural tool in use for centuries. . . . The bill is well recognized and may be entertained notwithstanding the statutes and rules of court relative to discovery. . . . Furthermore, because a pure bill of discovery is favored in equity, it

should be granted unless there is some well founded objection against the exercise of the court's discretion. . . .

"To sustain the bill, the petitioner must demonstrate that what he seeks to discover is material and necessary for proof of, or is needed to aid in proof of or in defense of, another action already brought or about to be brought. . . . Although the petitioner must also show that he has no other adequate means of enforcing discovery of the desired material, [t]he availability of other remedies . . . for obtaining information [does] not require the denial of the equitable relief . . . sought. . . . This is because a remedy is adequate only if it is one which is specific and adapted to securing the relief sought conveniently, effectively and completely. . . . The remedy is designed to give facility to proof. . . .

"Discovery is confined to facts material to the plaintiff's cause of action and does not afford an open invitation to delve into the defendant's affairs. . . . A plaintiff must be able to demonstrate good faith as well as probable cause that the information sought is both material and necessary to his action. . . . A plaintiff should describe with such details as may be reasonably available the material he seeks . . . and should not be allowed to indulge a hope that a thorough ransacking of any information and material which the defendant may possess would turn up evidence helpful to [his] case. . . . What is reasonably necessary and what the terms of the judgment require call for the exercise of the trial court's discretion." (Citations omitted; internal quotation marks omitted.) *Berger* v. *Cuomo*, 230 Conn. 1, 5–7, 644 A.2d 333 (1994).

"The plaintiff who brings a bill of discovery must demonstrate by detailed facts that there is probable cause to bring a potential cause of action. Probable cause is the knowledge of facts sufficient to justify a

reasonable man in the belief that he has reasonable grounds for presenting an action. . . . Its existence or nonexistence is determined by the court on the facts found. . . . Moreover, the plaintiff who seeks discovery in equity must demonstrate more than a mere suspicion; he must also show that there is some describable sense of wrong."[6] (Citation omitted; internal quotation marks omitted.) Id., 7. "Whether particular facts constitute probable cause is a question of law." *McMahon* v. *Florio*, 147 Conn. 704, 707, 166 A.2d 240 (1960).

## I

We first address the defendant's claim that the evidence presented at the March 2, 2001 hearing did not support the trial court's factual findings. Specifically, the defendant challenges the court's findings that: (1) the defendant amended its contracts with the syndicators so that it could publish the Sunday comic strips on Saturday, prior to their release date; (2) both the defendant and one of the syndicators acknowledged to the plaintiff the existence of a preclusive contractual condition; and (3) under the amended contracts, the syndicators agreed that they would not allow the plaintiff to publish the Sunday comic strips on Saturday.

As a threshold matter, we note that the plaintiff does not claim that it was harmed in any way by the defen-

---

[6] Both of the parties and the trial court treated the probable cause standard for evaluating an alleged cause of action set forth in *Berger* v. *Cuomo*, supra, 230 Conn. 1, as the applicable standard in this case. Accordingly, we leave for another day the questions of whether (1) the standards governing equitable bills of discovery also govern petitions filed pursuant to § 52-156a; see *Cadle Co.* v. *Drubner*, 64 Conn. App. 69, 777 A.2d 1286 (2001) (applying *Berger* standards to § 52-156a petition); and (2) the probable cause language in *Berger* was an unduly constricted interpretation of our prior jurisprudence governing bills of discovery. See *Aetna Life & Casualty Co.* v. *Union Trust Co.*, 230 Conn. 779, 788 n.5, 646 A.2d 799 (1994) (when parties have not briefed or argued law that could affect case, "we decide [the] case on the basis on which it was tried and decided in the trial court, and briefed and argued in this court").

dant's publication of the Sunday comics on Saturday. Rather, it claims only that it was injured by the syndicators' refusal to allow it to publish those comics. The court therefore could not have relied on its finding that the defendant and the syndicators amended their contracts to allow such publication as support for its legal conclusions. Furthermore, if there was other evidence to support the trial court's finding of an exclusive contract between the defendant and one of the syndicators, it is irrelevant whether they expressly acknowledged its existence. We conclude, therefore, that we need not consider whether the evidence presented at the hearing supported the trial court's findings that the defendant and the syndicators amended their contracts or acknowledged the existence of an exclusive contract. Accordingly, we need determine only whether the evidence presented at the hearing supported the trial court's finding that the defendant and the syndicators had exclusivity agreements with respect to the Sunday comics. We conclude that the evidence was sufficient to support this finding.

We note that the existence of contractual exclusivity provisions between the defendant and the syndicators with respect to the publication of the Sunday comics was not a fact relied on by the plaintiff in support of its bill of discovery but, rather, was one of the items of information sought by the plaintiff in its petition. It would defy common sense, therefore, to conclude that, in order for the trial court to grant the petition, the plaintiff was required to establish by a preponderance of the evidence that the defendant and the syndicators had exclusive contractual arrangements.[7] We conclude,

---

[7] Both parties agree that the evidentiary standard for determining whether unchallenged factual findings support the granting of a bill of discovery is whether the findings constitute probable cause to believe that the plaintiff has a cause of action against the defendant. See footnote 6 of this opinion. The parties do not address, however, the question of what is the proper evidentiary standard for evaluating disputed factual findings.

instead, that the plaintiff was required to establish only that there was probable cause to believe both that the defendant and the syndicators had such arrangements and that those arrangements provided the basis for a cause of action. See *Berger* v. *Cuomo*, supra, 230 Conn. 7 (standard for determining whether trial court's unchallenged factual findings warrant granting of bill of discovery is whether facts demonstrate "that there is probable cause to bring a potential cause of action").

The following evidence supported the trial court's finding that there was probable cause to believe that the defendant and the syndicators had an agreement that prevented the syndicators from allowing the plaintiff to publish the Sunday comics. Ellis testified that, almost one year before the hearing, she had written to the defendant requesting that it release the exclusivity provisions for certain comic strips. Shortly thereafter, the defendant, through its parent corporation, responded only that it would look into the matter. The defendant provided no additional response. The trial court reasonably could have inferred from this testimony that, if the defendant did not have an exclusivity agreement with the syndicators, the natural response to the plaintiff's request would have been for it to deny the existence of such an arrangement or to assert that it had no control over the matter. Accordingly, the trial court could have inferred the existence of such an agreement from the defendant's failure to make a denial or to assert the absence of control.

Ellis also testified that she called Davis to inquire why the defendant objected to the plaintiff's having access to the Sunday comics. Davis responded that it was important for the newspaper to have a unique product. The trial court reasonably could have inferred from this response that the defendant believed that it had the ability to maintain the uniqueness of its Sunday

newspaper by preventing the plaintiff from having access to the Sunday comics that it published.

Ellis also testified that, at some point in the year 2000, the Hartford Courant started publishing the Sunday comics in its early Sunday edition, which is actually published on Saturday. Prior to that time, Ellis had considered the plaintiff to be contractually bound to honor the release dates printed on the comics. The trial court reasonably could have inferred from this testimony that the syndicators' refusal to permit the plaintiff to publish the Sunday comics was not based on their reluctance to release the Sunday comics for publication before their release date, but, rather, on some other consideration that applied to the plaintiff, but not to the defendant.

We conclude that, on the basis of this evidence, the trial court reasonably could have determined that there was probable cause to believe that the defendant and the syndicators had a contractual arrangement that prevented the syndicators from allowing the plaintiff to publish the Sunday comics published by the defendant.

II

We next consider whether, if proven, the existence of such exclusive contracts, in and of itself, would constitute probable cause to believe that the plaintiff had a cause of action against the defendant. The trial court concluded that there was probable cause to believe that, by entering into exclusive contracts with the syndicators, the defendant had (1) tortiously interfered with the plaintiff's contractual rights; (2) violated CUTPA; and (3) violated Connecticut's antitrust laws. The defendant argues that the plaintiff never claimed, and the evidence did not establish, that the defendant had interfered with the plaintiff's contractual relations. It also argues that the plaintiff did not establish probable cause to believe that all of the elements of an antitrust claim

exist. Finally, it argues that, in the absence of an antitrust violation, the plaintiff could not establish probable cause to believe that a violation of CUTPA existed. We assume, for purposes of our analysis, that the contracts between the defendant and the syndicators contained exclusivity provisions. We agree with the defendant, however, that the existence of such provisions would not constitute probable cause with respect to any of the causes of action found by the trial court.

## A

We first consider whether the trial court properly determined that the existence of an exclusive contractual arrangement constituted probable cause to believe that the defendant tortiously had interfered with the plaintiff's contractual arrangements. The defendant argues that the plaintiff never made any such claim before the trial court and, even if it had, that the claim was not supported by the evidence. The plaintiff concedes that it had made no such claim.

We previously have recognized that "the right of a plaintiff to recover is limited by the allegations of the complaint . . . and any judgment should conform to the pleadings, the issues and the prayers for relief." (Citation omitted; internal quotation marks omitted.) *Kawasaki Kisen Kaisha, Ltd.* v. *Indomar, Ltd.*, 173 Conn. 269, 272, 377 A.2d 316 (1977). We conclude, therefore, that the trial court should not have raised this issue sua sponte. Accordingly, we need not consider whether the evidence established probable cause to believe that the plaintiff had a cause of action for tortious interference with its contractual relations.

## B

We next consider the defendant's claim that the trial court improperly determined that there was probable cause to believe that the defendant had violated Con-

necticut's antitrust statutes. Specifically, the defendant claims that the plaintiff failed to demonstrate that: (1) competition is likely to be harmed by the existence of the exclusivity provisions; (2) the syndicators would have allowed the plaintiff to publish the Sunday comics in the absence of an exclusive agreement with the defendant and, therefore, that the plaintiff was harmed by the agreement; and (3) the existence of the exclusivity provisions, in and of itself, is violative of the antitrust laws. We conclude that the first and third claims are conceptually inseparable, and, accordingly, we treat them as a single claim. We also conclude that the existence of contractual exclusivity provisions between the defendant and the syndicators, if proved, would not, in and of itself, establish probable cause to believe that the antitrust laws have been violated. Because this determination is dispositive of the appeal, we need not consider the defendant's second claim.

As a preliminary matter, we address the plaintiff's claim that the record is inadequate to review the defendant's challenge to the trial court's legal conclusions. The following additional facts and procedural history are relevant to this claim. On September 7, 2001, the defendant, pursuant to Practice Book § 66-5, filed in the Appellate Court a motion for articulation of the factual and legal basis of the trial court's May 7, 2001 memorandum of decision. In accordance with the Practice Book, the motion was forwarded to the trial court for a ruling. The trial court denied the motion. The plaintiff claims that, because the trial court refused to provide the necessary articulation of its conclusion that there was probable cause to believe that the defendant had violated antitrust laws, the memorandum of decision does not set forth the necessary factual or legal basis for appellate review.

"The general purpose of [the relevant] rules of practice and their interplay is to ensure that there is a trial

court record that is adequate for an informed appellate review of the various claims presented by the parties. . . . One specific purpose of a motion for articulation of the factual basis of a trial court's decision is to clarify an ambiguity or incompleteness in the legal reasoning of the trial court in reaching its decision. . . . Further articulation . . . is unnecessary where the [memorandum of decision] adequately states its factual basis, and where the record is adequate for informed appellate review of the [judgment]." (Citations omitted; internal quotation marks omitted.) *State* v. *Cobb*, 251 Conn. 285, 383, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000).

In the present case, the trial court clearly set forth its factual findings and stated that those findings established probable cause to believe that the defendant had "persuaded the syndicators to refuse to deal with the [plaintiff] in violation of the Antitrust Act." The record is also clear that the court was made aware of the legal standards pertaining to antitrust law as set forth by the parties in their briefs to that court. In such cases, we assume that the trial court has applied the correct legal standards. See *State* v. *Crumpton*, 202 Conn. 224, 232, 520 A.2d 226 (1987). Accordingly, we conclude that the record is adequate for review.

The plaintiff claims that the exclusivity provision in the contracts between the defendant and the syndicators of certain Sunday comics violated General Statutes §§ 35-26 and 35-28 (b) and (d).[8] It claims that the effect of the provision was to prevent the plaintiff from offering those comics as part of an expanded weekend edition of its newspaper that would compete with the defendant's Sunday newspaper. The defendant counters that such exclusivity provisions are presumptively legal and procompetitive and, accordingly, that in the

---

[8] See footnotes 2 and 3 of this opinion for the text of those statutes.

absence of any evidence that the contracts impaired competition as a whole, the plaintiff failed to establish probable cause to believe that a violation had occurred. We agree with the defendant.

This court previously has recognized that "[u]nder the common law, the well-settled rule is that an anticompetitive covenant ancillary to a lawful contract is enforceable if the restraint upon trade is reasonable. . . . To satisfy this requirement of reasonableness, we have stated that the restraint must be limited in its operation with respect to time and place and afford no more than a fair and just protection to the interests of the party in whose favor it is to operate, without unduly interfering with the public interest." (Citations omitted; internal quotation marks omitted.) *Elida, Inc.* v. *Harmor Realty Corp.*, 177 Conn. 218, 225–26, 413 A.2d 1226 (1979). This principle has come to be known as the "rule of reason." Id., 225.

"In rule of reason cases, the plaintiff bears the initial burden of showing that the alleged combination or agreement produced adverse, anticompetitive effects within the relevant product and geographic markets. . . . The plaintiff may satisfy this burden by proving the existence of actual anticompetitive effects, such as reduction of output, increase in price, or deterioration in quality of goods and services." (Citation omitted.) *Orson, Inc.* v. *Miramax Film Corp.*, 79 F.3d 1358, 1367 (3d Cir. 1996). "If a plaintiff meets his initial burden of adducing adequate evidence of market power or actual anticompetitive effects, the burden shifts to the defendant to show that the challenged conduct promotes a sufficiently pro-competitive objective." Id., 1367–68.

"[T]here are [however] certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal with-

out elaborate inquiry as to the precise harm they have caused or the business excuse for their use." (Internal quotation marks omitted.) *Elida, Inc.* v. *Harmor Realty Corp.*, supra, 177 Conn. 227. Such agreements constitute "per se" antitrust violations. Id. "[T]he 'rule of reason' was intended to be the prevailing standard to be applied for the purpose of determining whether a particular act had or had not brought about the wrong against which the statute provided in a given case. . . . 'Per se' rules of illegality should be applied only to conduct which is shown to be 'manifestly anticompetitive.' " (Citation omitted.) Id., 230–31.

A number of courts have concluded that the exclusive licensing of syndicated features to newspaper publishers is presumptively procompetitive and, therefore, does not violate the federal antitrust statutes.[9] See *Paddock Publications, Inc.* v. *Chicago Tribune Co.*, 103 F.3d 42 (7th Cir. 1996), cert. denied, 520 U.S. 1265, 117 S. Ct. 2435, 138 L. Ed. 2d 196 (1997); *Woodbury Daily Times Co.* v. *Los Angeles Times-Washington Post News Service*, 616 F. Sup. 502 (D.N.J. 1985). In *Paddock Publications, Inc.*, the plaintiff, a publisher of a daily newspaper in the Chicago area, claimed that two larger newspapers in the same geographical area had "locked up the 'most popular' or 'best' supplemental [syndicated] services and features, [thereby] injuring consumers by frustrating competition." *Paddock Publications, Inc.* v. *Chicago Tribune Co.*, supra, 44. The plaintiff conceded that "many quality comics and features [were] available to it . . . but insist[ed] that the best ones [were] committed to its larger rivals." Id. The District Court dismissed the complaint for failure to state a claim on which relief might have been granted. Id. On

---

[9] General Statutes § 35-44b provides: "It is the intent of the General Assembly that in construing sections 35-24 to 35-46, inclusive, the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes."

appeal, the Court of Appeals, implicitly applying the rule of reason, concluded that "exclusive stories and features help the newspapers differentiate themselves, the better to compete with one another. A market in which every newspaper carried the same stories, columns, and cartoons would be a less vigorous market than the existing one." Id., 45. It also concluded that there was no evidence that the plaintiff had ever attempted to outbid the rival newspapers for the syndicated features; id., 44; or that those newspapers had colluded with each other, thereby harming consumers. Id., 45.

Finally, the court in *Paddock Publications, Inc.*, rejected the plaintiff's implicit claim that the syndicated features were "essential facilities"; id., 44; that "could not feasibly be duplicated [and therefore] must be shared among rivals . . . ." Id., 45. It concluded, rather, that "this case does not involve a single facility that monopolizes one level of production and creates a potential to extend the monopoly to others. We have, instead, competition at each level of production; no one can 'take over' another level of production by withholding access from disfavored rivals." Id. Accordingly, the Court of Appeals affirmed the judgment of the District Court dismissing the claim. Id., 47.

In *Woodbury Daily Times Co.* v. *Los Angeles Times-Washington Post News Service*, supra, 616 F. Sup. 502, the court considered a similar claim. Applying the rule of reason rather than a per se standard; id., 506; the court determined that "[t]he ability to present a unique product in the newspaper or broadcast media contributes to the value of a paper or television station and enhances its competitive edge in the market place. Limited exclusivity grants are thus the custom of these industries. . . . One aspect of the [competing newspaper's] competitive draw would be lessened if another newspaper in the area published the same articles on

the same day, or even worse, published the articles before the [competing newspaper] chose to use them." Id., 510. "In the end, such exclusive subscriptions result in each interested area newspaper contracting with a different service, thus guaranteeing that the reading public has access to a wider variety of news reporting and opinions." Id., 511. Accordingly, the court granted the defendants' motion for summary judgment. Id., 512.

The plaintiff in this case in effect concedes that, under *Paddock Publications, Inc.*, and *Woodbury Daily Times Co.*, exclusivity provisions in contracts between newspapers and syndicators are, as a general rule, presumptively legal. It argues, however, that, because of the unusual factual circumstances of this case, those cases are not applicable here. Specifically, the plaintiff claims that, because the syndicators in this case have permitted the plaintiff to publish the same comics as the defendant on Monday through Saturday, the defendant cannot claim that the exclusivity provisions provide it with the marketplace advantage of being identified with those comics. Therefore, the plaintiff contends, the sole purpose and effect of the contractual restriction was to suppress competition in the market for expanded weekend newspapers, whether published on Saturday or Sunday, without any redeeming value for the marketplace. Accordingly, the plaintiff argues, the trial court properly concluded that the exclusivity provisions constituted per se violations of the antitrust laws. See *Elida, Inc.* v. *Harmor Realty Corp.*, supra, 177 Conn. 227 (recognizing that per se rule is applicable to "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable" [internal quotation marks omitted]).

Thus, the plaintiff implicitly concedes that, if the exclusivity provisions had prevented the plaintiff from publishing certain comics on a daily basis, they would

be presumptively legal. It argues, however, that, because the provisions prevent the plaintiff from publishing the comics *only* on Sunday, they do not enhance the defendant's competitiveness while they do impair the plaintiff's ability to compete and, accordingly, are presumptively illegal. We are not persuaded.

First, the exclusivity provisions complained of by the plaintiff in this case are, on their face, *less* restrictive than the exclusivity provisions found, under a rule of reason analysis, to be procompetitive in *Paddock Publications, Inc.*, and *Woodbury Daily Times Co.* We cannot perceive any reason why the fact that the plaintiff is permitted to publish the comics at issue on Monday through Saturday should relieve it of the burden of establishing the existence of the actual anticompetitive effects of preventing it from publishing the comics in a weekend edition, or impose on the defendant the burden of establishing redeeming procompetitive virtues of the provisions.

More fundamentally, we simply cannot reconcile the plaintiff's claim that the exclusivity provisions constitute per se violations of the antitrust laws because their only purpose is to suppress competition in the market for expanded weekend newspapers, with its claim that the provisions have no redeeming procompetitive virtues. If the provisions suppress competition, they do so only by making the defendant's Sunday newspaper more desirable to consumers than competing weekend newspapers that are prevented from publishing the same Sunday comics. This is the same procompetitive effect that the exclusivity provisions challenged in *Paddock Publications, Inc.*, and *Woodbury Daily Times Co.* were found to have had on the markets in those cases. Accordingly, we conclude that the exclusivity provisions between the defendant and the syndicators do not constitute per se violations of the antitrust statutes.

We also conclude that, under the rule of reason, the plaintiff has not met its burden of establishing probable cause to believe that "the alleged . . . agreement produced adverse, anticompetitive effects within the relevant product and geographic markets." *Orson, Inc.* v. *Miramax Film Corp.*, supra, 79 F.3d 1367. The plaintiff produced no evidence supporting "the existence of [any] actual anticompetitive effects, such as reduction of output, increase in price, or deterioration in quality of goods and services." Id. Rather, the evidence showed only that the plaintiff's inability to publish those comic strips may have been a factor in its decision whether to publish an expanded weekend newspaper. It is not unreasonable to infer from this evidence that the plaintiff believed that its planned weekend edition would be more competitive if it contained the Sunday edition of all of the comics that its newspaper contains on a daily basis. "The antitrust laws, however, were enacted for the protection of *competition,* not *competitors* . . . ." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Brunswick Corp.* v. *Pueblo Bowl-o-Mat, Inc.*, 429 U.S. 477, 488, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977).

We also reject the plaintiff's claim, essentially raised as an alternate ground for affirmance, that there is probable cause to believe that the eleven Sunday comic strips at issue in this case constitute an "essential facility" because the syndicators are the only source of those particular comics. The evidence showed that there are hundreds of syndicated comic strips available to the plaintiff. There simply is no evidence that the eleven comic strips that the plaintiff is prevented from publishing are essential for the publication of a viable newspaper. See *Paddock Publications, Inc.* v. *Chicago Tribune Co.*, supra, 103 F.3d 45 (rejecting "essential facilities" claim where case did "not involve a single facility that

monopolizes one level of production and creates a potential to extend the monopoly to others").

We conclude that, in the absence of any evidence establishing the existence of any actual anticompetitive effects of the exclusivity provisions, the plaintiff has not established probable cause to believe that the antitrust statutes were violated.

## III

The defendant also claims that the trial court improperly concluded that there was probable cause to believe that the defendant had violated CUTPA. It argues that, because the CUTPA claim was predicated solely on the antitrust claim, and because the plaintiff did not establish probable cause to believe that the antitrust laws had been violated, there is no basis for the claim. The plaintiff contends, to the contrary, that, even if the antitrust laws were not violated, the trial court properly found probable cause to believe that the defendant had engaged in unscrupulous or oppressive acts. We agree with the defendant.

"It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other businessmen]. . . .

"All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair

because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. . . . Thus a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy. . . . Furthermore, a party need not prove an intent to deceive to prevail under CUTPA." (Citations omitted; internal quotation marks omitted.) *Cheshire Mortgage Service, Inc.* v. *Montes*, 223 Conn. 80, 105–106, 612 A.2d 1130 (1992).

The trial court concluded that there was probable cause to believe that the defendant had engaged in "unscrupulous or oppressive acts, causing a substantial injury to the readers of the [plaintiff's] publication and to the [plaintiff]." In light of the evidence presented at the hearing, the "unscrupulous or oppressive acts" referred to by the trial court could only have been the exclusivity provisions in the contracts between the defendant and the syndicators. As noted by the court in *Woodbury Daily Times Co.* v. *Los Angeles Times-Washington Post News Service*, supra, 616 F. Sup. 510, however, "[l]imited exclusivity grants are . . . the custom" in the newspaper industry. Moreover, such provisions are generally procompetitive and, as such, are in furtherance of public policy and presumptively legal. See *Paddock Publications, Inc.* v. *Chicago Tribune Co.*, supra, 103 F.3d 45. We conclude that, in the absence of any evidence of substantial injury to consumers or to the plaintiff,[10] these customary, procompetitive and presumptively legal contractual provisions do not constitute probable cause to believe that the criteria of the "cigarette rule" have been met. Accordingly, we conclude that the trial court improperly determined

---

[10] As we have noted, the only injury claimed by the plaintiff is that the inability to publish the eleven Sunday comic strips at issue may make its planned weekend edition less competitive than it otherwise would have been.

that there was probable cause to believe that the defendant had violated CUTPA.

## IV

We next address the plaintiff's claim that it is entitled to a new hearing at which it should be allowed to subpoena a representative of the defendant to provide additional facts in support of its bill of discovery. We disagree.

The following additional facts and procedural history are relevant to this claim. Prior to the hearing on the bill of discovery, the plaintiff attempted to serve a subpoena directed to Marty Petty, a former publisher of the Hartford Courant, or, in the alternative, the defendant's designee with knowledge of its relationship with the syndicators. The subpoena directed the production of "[a]ny and all correspondence by and between [the syndicators] and the [defendant] in regard to restrictions on access to the agreements between the syndicators and the [defendant] related to the so-called Sunday comics, and the nature and extent of distribution of the so-called Sunday Hartford Courant which includes the Sunday comics." Service was attempted at the offices of the defendant's headquarters. At the time that the attempted service was made, however, Petty was no longer employed by the defendant.

The defendant moved to quash the subpoena on the grounds that: (1) service had not been made on Petty and the defendant was, therefore, not required to respond to the subpoena; and (2) the plaintiff was not entitled to any discovery until after a ruling on its petition for a bill of discovery. The trial court granted the motion to quash, concluding that the plaintiff was required to establish probable cause to believe that it had a cause of action against the defendant before the plaintiff would be entitled to discovery.

Thereafter, the plaintiff filed a second subpoena directed to Louis J. Golden, the deputy publisher of the Hartford Courant. The subpoena directed production of the same documents listed in the first subpoena. The defendant again filed a motion to quash and a motion for sanctions against the plaintiff for its failure to abide by the trial court's order quashing the first subpoena. The motion to quash was argued before the trial court at the commencement of the hearing on the bill of discovery. The trial court granted the motion.

The plaintiff now argues that, if this court determines that the record before the trial court did not establish probable cause to believe that the plaintiff had a cause of action against the defendant, this court should remand the case for a hearing at which the plaintiff should be allowed to subpoena a representative of the defendant to provide limited testimony as to the *existence* of the contractual exclusivity provisions, as distinct from their substance. The plaintiff concedes that it should not be able to compel production of the same information sought in the bill of discovery by use of a subpoena, but argues that the bill of discovery was aimed at the history, nature and substance of the contractual provisions, not their mere existence, of which the plaintiff already knew indirectly through hearsay.

We conclude that the plaintiff is not entitled to a new hearing. We have assumed for purposes of our analysis that the restrictive contractual provisions exist and have determined that their existence does not constitute probable cause to believe that the plaintiff has a cause of action against the defendant. Accordingly, nothing would be gained by allowing the plaintiff to establish the existence of the contractual provisions through direct testimony by a representative of the defendant.

The judgment is reversed and the case is remanded with direction to render judgment denying the petition for a bill of discovery.

In this opinion KATZ and ZARELLA, Js., concurred.

BORDEN, J., with whom VERTEFEUILLE, J., joins, dissenting. Until 1994, when we decided *Berger* v. *Cuomo*, 230 Conn. 1, 644 A.2d 333 (1994), and included therein one brief passage of dictum; see id., 7–8; which I discuss later in this opinion, our law on the bill of discovery was adequate to protect both those who sought such a bill and those who sought to resist it. By applying the *Berger* dictum dispositively to the facts of the present case, the majority has, in my view, unduly raised the bar to the issuance of a bill of discovery. I therefore dissent.

Our jurisprudence regarding bills of discovery prior to *Berger* may be summarized as follows. Two types of the bill of discovery exist at equity: the bill of discovery and relief, and the pure bill of discovery. The former is reserved for those circumstances in which a plaintiff not only seeks some information or document in the possession of the adverse party, but also requests that the court take some affirmative action on the asserted cause of action. The bill of discovery and relief is, therefore, the equitable equivalent of a plenary action at law. See generally G. Bispham, Principles of Equity (11th Ed. 1931) § 525, pp. 437–38 (bill of discovery and relief vehicle by which claim made for both discovery and equitable remedy; pure bill of discovery aids prosecution of legal claim); 3 J. Story, Equity Jurisprudence (14th Ed. 1918) § 1930, p. 519 (pure bill of discovery, as distinguished from bill of discovery and relief, seeks no remedy other than disclosure of certain information or documentation); 1 J. Pomeroy, Equity Jurisprudence (5th Ed. 1941) § 191, p. 277 (same). The second type of bill, the pure bill of discovery, is at issue in the

present case and is the only bill addressed in this dissent.

A pure bill of discovery "is an action in equity ancillary to the original action. The only relief sought [therein] is a discovery of facts to be used as evidence in that action. . . . *A pure bill of discovery is favored in equity and will be granted unless there is some wellfounded objection against the exercise of the court's jurisdiction. Peyton* v. *Werhane,* 126 Conn. 382, 389, 11 A.2d 800 [1940]; *Skinner* v. *Judson,* 8 Conn. 528, 533 [1831]; Swift, Evidence, p. 116; 2 Swift, Digest, p. 210; 1 [J. Pomeroy, supra] §§ 142, 144, 190a, 191, 195; 17 Am. Jur. 6, § 3; see *Middletown Bank* v. *Russ,* 3 Conn. 135, 140 [1819]; *Hoyt* v. *Smith,* 23 Conn. 177, 186 [1854]; *Norwich & W.R. Co.* v. *Storey,* 17 Conn. 364, 371 [1845]; *Welles* v. *Rhodes,* 59 Conn. 498, 506, 22 A. 286 [1890]. To sustain a pure bill of discovery, a party must show that the matter he seeks to discover is material and necessary to the proof of, or is needed to aid in the proof of, another action, already brought or about to be brought, and that he has no other adequate means of enforcing discovery of the matter. 3 [J. Story, supra] §§ 1930, 1943; 1 [J. Pomeroy, supra, § 191, pp. 278–79 and] §§ 197a, 197b; Hare, Discovery, [1849] p. 110; 17 Am. Jur. 8. [In this regard, it] might be stated parenthetically that the cases in other jurisdictions, and the earlier cases in this state, make a distinction between pure bills of discovery and bills for discovery and relief. *In the latter, the petitioner must show that he has stated a valid cause of action for the equitable relief in support of which he seeks to invoke the equitable powers of the court for a discovery. Middletown Bank* v. *Russ,* supra [140]; *Norwich & W.R. Co.* v. *Storey,* supra [371]; *Welles* v. *Rhodes,* supra [506]; Story, Equity Pleadings (9th Ed.) § 324a; 1 [J. Pomeroy, supra] § 229, p. 404.

"The law of discovery has been invested at times with unnecessary mystery. There are few fields where

considerations of practical convenience should play a larger role. The rationale of the remedy, when used as an auxiliary process in aid of trials at law, is simplicity itself. At times, cases will not be proved, or will be proved clumsily or wastefully, if the litigant is not permitted to gather his evidence in advance. When this necessity is made out with reasonable certainty, a bill in equity is maintainable to give him what he needs. . . . There were other reasons in times past, when parties were not permitted to be witnesses, and when there was no compulsory process for the production of books or documents. *Carpenter* v. *Winn*, 221 U.S. 533 [31 S. Ct. 683, 55 L. Ed. 842 (1911)]; *Pressed Steel Car Co.* v. *Union Pacific R. Co.*, 240 Fed. 135, 136 [1917]. Today the remedy survives, chiefly, if not wholly, to give facility to proof. *Sinclair Refining Co.* v. *Jenkins Petroleum Process Co.*, 289 U.S. 689, 693, 53 S. Ct. 736, 77 L. Ed. 1449 [1933]. The right to a discovery, however, does not extend to all material facts but only to those which pertain to a party's cause of action or defense. Discovery cannot be used to pry into the opposing party's case or to find out the evidence by which that case will be supported. *Peyton* v. *Werhane*, supra [126 Conn. 389]; *Downie* v. *Nettleton*, 61 Conn. 593, 596, 24 A. 977 [1892]; 1 [J. Pomeroy, supra] § 201. Discovery does not sanction impertinent intrusion, and there must be a showing of good faith and probable cause. *Sinclair Refining Co.* v. *Jenkins Petroleum Process Co.*, supra, 697. In passing upon the bill, the court exercises a discretionary power within recognized limits. [Id.]; see *Kiessling* v. *Kiessling*, 134 Conn. 564, 568, 59 A.2d 532 [1948]; *May* v. *Young*, 125 Conn. 1, 10, 2 A.2d 385 [1938]; *Katz* v. *Richman*, 114 Conn. 165, 171, 158 A. 219 [1932]; 1 [J. Pomeroy, supra] §§ 202, 203; 3 Story, Equity Jurisprudence [supra] § 1936." (Emphasis added; internal quotation marks omitted.) *Pottetti* v. *Clifford*, 146 Conn. 252, 257–59, 150 A.2d 207 (1959). "The granting of a bill and the

terms of the judgment rendered call for the exercise by the trial court of a sound discretion as to what is reasonably necessary." Id., 263.

Furthermore, this statement of the legal principles applicable to the pure bill of discovery is consistent with those articulated in the authoritative treatises on equity. According to those authorities, the party seeking a bill of discovery "must . . . state a case which will, if he is the plaintiff at law, constitute a good ground of action . . . . If it is clear that the action . . . is unmaintainable at law, Courts of Equity will not entertain a bill for any discovery in support of it, since the discovery could not be material, but must be useless. *This however is so delicate a function that Courts of Equity will not undertake to refuse a discovery upon such grounds unless the case is entirely free from doubt. If the point be fairly open to doubt or controversy, Courts of Equity will grant the discovery and leave it to Courts of Law to adjudicate upon the legal rights of the party seeking the discovery.*" (Emphasis added.) 3 J. Story, Equity Jurisprudence, supra, § 1941, pp. 525–26; see also 1 J. Pomeroy, supra, § 198, pp. 303–304 ("[i]f the result of the controversy at law is doubtful, even when the defendant in the suit for a discovery has denied the plaintiff's title, or has set up matter which if true would operate as a complete defense, the court of equity will, in general, grant the discovery, and leave the issue to be tried and finally determined by the court of law").

Gauged by these standards, it is clear to me that the trial court did not abuse its discretion in issuing this limited bill of discovery. The court made specific findings that: (1) the material sought would be necessary or helpful to prove claims in a suit yet to be filed; (2) the plaintiff had no alternative means of obtaining the information other than by a court order; (3) there was a good faith basis to conclude that the material was

necessary for the plaintiff to determine whether the defendant had violated the law; and (4) there was probable cause to believe that the plaintiff has a cause of action against the defendant on one or more of the bases stated in its petition.[1] As previously stated, such a bill is favored, and should be issued absent a well-founded objection to it. The fact that, ultimately, the plaintiff may not prevail on the lawsuit it intends to bring, should not constitute such an objection. Moreover, the discovery sought in the present case was limited to one contract document. Thus, this was not an instance in which the plaintiff sought to misuse the bill of discovery as a tool to pry needlessly into the defendant's affairs. Finally, even if the document sought ultimately did not support the plaintiff's cause of action, it hardly can be maintained that, at such an early stage of the proceedings, when the trial court exercised its discretion to issue the bill, the ultimate liability of the defendant on the claims that the plaintiff intends to bring was entirely free from doubt or controversy.

Indeed, as I read the majority opinion, it does not quarrel with the proposition that, measured solely by these standards, the trial court did not abuse its discretion in ordering the bill of discovery in the present case. Instead, the majority relies on, and applies in a very stringent way, the following passage from *Berger* v. *Cuomo*, supra, 230 Conn. 7–8: "*The plaintiff who brings a bill of discovery must demonstrate by detailed facts that there is probable cause to bring a potential cause of action.* 'Probable cause is the knowledge of facts sufficient to justify a reasonable man in the belief that he has reasonable grounds for presenting an action. . . . Its existence or nonexistence is determined by the court on the facts found.' . . . *Cosgrove Development*

---

[1] I discuss later in this opinion my disagreement with the majority regarding the quantum of proof necessary to meet the probable cause standard for the issuance of a bill of discovery.

*Co.* v. *Cafferty*, 179 Conn. 670, 671, 427 A.2d 841 (1980). Moreover, the plaintiff who seeks discovery in equity must demonstrate more than a mere suspicion; he must also show that there is some describable sense of wrong. *The plaintiff need not, however, state each claim with technical precision; he need only set forth facts that fairly indicate that he has some potential cause of action. Pottetti* v. *Clifford,* supra, 146 Conn. 259." (Emphasis added.)

I perceive several flaws in endorsing the probable cause standard articulated in *Berger.* For instance, the first, emphasized sentence of the previously quoted passage, which the majority singularly relies on in reversing the judgment of the trial court in the present case, has no citation for the proposition stated therein, because none is available. Prior to *Berger,* we had never imposed a showing of detailed facts on a bill of discovery. Moreover, the last sentence of the passage in *Berger,* quoted from *Pottetti,* is inconsistent with the first sentence. Indeed, it is that last sentence that defines the contours of the notion of probable cause in the context of a bill of discovery: without stating or proving each claim with technical precision, the plaintiff need only set forth facts *fairly indicating that it has some potential cause of action.* Unless it is clear that it has none, whether that potential cause of action ultimately will survive a motion to strike or a motion for summary judgment, or whether the plaintiff will prevail on the merits after a trial, is to be left to a later determination, when and if that action is brought.

Thus, the majority has taken the requirement that the plaintiff establish "a valid cause of action," which is applicable only to the bill of discovery and relief; *Pottetti* v. *Clifford,* supra, 146 Conn. 258; and applied it to the present case, which involves the pure bill of

discovery.[2] In other words, the majority has imposed on both types of the bill of discovery the requirement that the plaintiff show the existence of probable cause with respect to each and every element of the cause of action that he intends to file. That this is the effect of the majority opinion is demonstrated by the detailed legal analyses that it presents in order to refute the plaintiff's potential causes of action. Neither our law, nor the law of equity generally, supports such a rigorous standard for the issuance of a bill.

As a practical matter, the majority's analysis requires a party who seeks to gain access to a single document, as in the present case, in order to facilitate its proof of the cause of action that it intends to bring—or, as is more likely, in order simply to determine whether it can, in good faith, bring such an action—to be able to establish a prima facie case on the merits of that potential cause of action. In effect, the party must demonstrate, and the trial court must determine, in advance of the issuance of the bill, that the plaintiff's underlying claim, in aid of which it seeks the bill of discovery, has merit. The issuance of a bill of discovery has never had to surmount such a high threshold.

---

[2] Although we did not expound upon our suggestion in *Pottetti* that a party seeking to sustain a bill of discovery and relief bears a greater burden than one who utilizes a pure bill of discovery, the reasoning behind such a distinction is obvious. As previously indicated, a bill of discovery and relief goes beyond an informational request and requires the court to resolve a party's substantive claims. Because, in that circumstance, the function of the court does not end upon disposition of the pure discovery request, but rather continues through a consideration of the merits of the case, it makes sense to require the court to determine, at the outset, whether there exists probable cause to support the various elements of the causes of action alleged. When dealing with a pure bill of discovery, however, the court's only function is to pass upon the necessity of a party's informational request. Imposition of the more stringent probable cause standard articulated in *Berger* is thus improper in such a case because the underlying claims are not before the court for disposition on the merits, as are the claims in a proceeding on a bill of discovery and relief.

Moreover, as a matter of policy, it should not have to do so. First, erecting such a high threshold is likely to inhibit, unduly, the bringing of bills of discovery, even where their laudable goal is to help the potential plaintiff who has a good faith—but mistaken—belief that he has a cause of action against the defendant to determine whether there is such a valid claim. For example, if the document in the present case is as legally benign as the majority says it is, and if the majority is as correct on the applicable law as it purports to be, then the issuance of the bill would, in all likelihood, demonstrate to the plaintiff the futility of its intended, potential causes of action. In that event, then, the result of the issuance of the bill would be that a claim that otherwise might have been brought will not be brought. We should not, as a matter of policy, rule out that possible result.

The majority's approach, moreover, effectively penalizes the cautious and prudent lawyer who, rather than simply alleging her cause of action and thereby engaging the full panoply of judicial machinery—discovery requests, depositions, interrogatories, and the like—instead seeks only to gain access to limited information or documents in order to determine that she will be able to prove that action. This record amply demonstrates such a cautious and prudent course of conduct.

Second, if the plaintiff nonetheless brings a bill of discovery despite the high threshold set by the majority in the present case, believing in good faith that it can surmount it, it will then have to put on its best version of a prima facie case, and the trial court will have to delve as deeply into the merits, not of the matter before it, but of the potential claim asserted in the bill, as the majority has done in the present case. Thus, every bill of discovery will be, in effect, a minitrial of the potential claim, without, however, the critical document or documents sought by the bill.

The unnecessary burdens of such a regime on the administration of justice are obvious. First, requiring a court to evaluate the probable success of a claim before suit is even initiated and without critical information sought in the bill itself is unfairly prejudicial and may, ultimately, thwart the administration of justice by needlessly defeating a potentially good cause of action. Second, as discussed previously, the majority's application of *Berger* creates a disincentive to utilize pure bills of discovery and an incentive to file suit and avail oneself of the vast array of discovery tools commonly employed in the initial stages of litigation. There is no justification, however, for the attendant waste of judicial resources that otherwise may be saved by first exploring the availability of information or evidence to support a claim in a bill of discovery. Third, forcing the trial court to evaluate the merits of a potential cause of action up front may result in the wasteful repetition of its duties, as there may be instances in which the trial court, after a detailed analysis of the claim such as the majority employs in this appeal, finds probable cause to bring a claim in a proceeding on the bill of discovery, but subsequently determines, in ruling on a motion to strike, motion to dismiss, or motion for summary judgment, that the claim is, ultimately, unsupportable.

I recognize what may lie behind the majority's high threshold, namely, a fear of opening the proverbial floodgates to numerous, bad faith fishing expeditions under the guise of bills of discovery. This fear, however, is unfounded. First, before *Berger*, and under *Pottetti*, no such flood of bills has ever occurred. This is undoubtedly because, in most cases, plaintiffs have the necessary information to state their claims, and then can use the normal rules of discovery to gain what they need in order to prove those claims. Furthermore, it is undoubtedly expensive to file and litigate a separate bill of discovery; there is, therefore, an economic disin-

centive to frivolous filings. Finally, the trial court always has the discretion to weed out bad faith claims, and to sanction parties and counsel for engaging in such conduct. I have full confidence in the abilities of our trial judges to recognize when the bill is being abused.

I would, therefore, affirm the judgment of the trial court issuing the bill of discovery.